IN FEDERAL DISTRICT COURT
DISTRICT OF SOUTH DAKOTA

| | |
|---|---|
| Eric Smith | ) |
|     Petitioner | ) Case # 23- 4174 |
| | ) |
|     V. | ) COMPLAINT/TEMPORARY AND |
| | ) PERMANENT INJUNCTION REQUEST |
| City Of Yankton | ) |
| State of South Dakota | ) |
| First Judicial Circuit Court | ) |
| County Of Yankton | ) |
|     Respondents | ) |

1. The Petitioner comes before this Court to state that on Thursday September 21st of 2023 that the Yankton Police Department in Yankton County South Dakota approached the Petitioner in regards to having Trump Flags in the Public Right of way off of highway 81 by TSC in Yankton, SD. The Petitioner was informed that he would be cited and was cited for Content neutral prohibited.

2. Petitioner was also arrested for Obstruction for not giving the officers the Political Flags for "EVIDENCE OF A CRIME". The Petitioner was also charged with resisting even when plaintiff told him he was not resisting. Petitioners fiancée who has a Traumatic Brain Injury was Highly Traumatized and unable to drive. She was left for dead along with her six-year-old daughter by Yankton, PD.

3. The crime the Petitioner was charged with before being arrested for obstruction and resisting arrest is as set out below

Sec. 27-78. - Content neutral prohibitions.

Signs shall not be erected or maintained in the following manner in the city unless otherwise specifically provided for in this chapter:

(1)

No sign or sign structure shall resemble, imitate, simulate, or conflict with traffic control signs or devices which are found within the Manual of Uniform Traffic Control Devices.

(2)

No sign or sign structure shall mislead or confuse persons traveling on public streets if a traffic hazard is caused thereby.

Signs shall not be erected or maintained in the following locations in the city:

(1)

No sign shall be placed in any location which creates a safety hazard by obstructing the clear view of pedestrians or vehicles.

(2)

No sign shall be placed in any location which obscures a government sign or signal.

(3)

No sign or sign structure shall be placed in any location which obstructs any required egress from a building or structure.

(4)

**No sign shall be attached to organic or inorganic natural matter (such as a tree), utility pole, public bench, street light, or a street sign.  This is Unconstitutional. This means no Sign even political can be placed in the soil even if it is on your own property or public property.**

(5)

**No sign shall be placed on any public property or public right-of-way.**

**(6)  I had flags placed in a public right of way that were political. This tramples on the first amendment rights of myself and the public to enjoin in Political Free Speech and to have public discourse and conversations. The right to assemble and petition as well. I cannot voice a opinion either by having temporary flags. This would be censorship.**

Trailer or vehicle signs which are parked or located for the primary purpose of displaying the sign are prohibited.  This would also be unconstitutional. Especially if the sign was political. Especially if the sign was in a persons driveway on a trailer for the purposes of display. That would also be a first amendment issue as well.

(Ord. No. 956, § 8, 6-10-13)

Note: They also moved up the Charge to a misdemeanor with as follows under their city code.

- **Sec. 27-84. - Criminal penalty.**

  **Any person who violates this article shall be guilty of a misdemeanor. The maximum penalty for each violation shall be five hundred dollars ($500.00). Each violation shall be a separate offense.**

  **(Ord. No. 956, § 14, 6-10-13)**

  **Note; Also the city has another code in which they MAY regulate Flags. Yes flags. Even political.**

## Sec. 27-74. - Sign permitting.

(a)

*General rule.* In order to erect, to alter, or to relocate a sign an owner or licensed sign contractor must first obtain a sign permit from the city. A sign permit may authorize the erection of one (1) or more signs.

(b)

*Exceptions.* The following signs do not require a permit but may be regulated by this chapter:

(1)

A-frame, T-frame and sandwich board sign.

(2)

Banner signs.

(3)

Construction contractor's sign.

(4)

Fan/booster sign.

(5)

## **Flags. – Clearly Unconstitutional. Even if in your own yard. This would tie into the no flags in organic soil. It would also tie into no flags on any type of matter. Tree etc. Purely Absurd.**

(6)

Identification signs.

(7)

Incidental signs.

(8)

Government signs.

(9)

Gas pump topper sign.

(10)

All signs excluded from the definition of "sign."

(11)

Ordinary maintenance and repairs of any sign.

(12)

Temporary signs.

4. The case law is very clear in Reed V Gilbert 2015 US Supreme Court that temporary flags are political free speech and a form of expression. This above appears to be a clear first amendment Violation. Also, there are many US Supreme Court Cases that protect political free speech and opinion exercising as well as political assembly and the right of the public to enjoin in political free speech. The City and State of South Dakota has turned this into a crime in order to censor conservatives all because they do not like a certain candidate.

This very Court Clearly would find this a First Amendment Violation. The Petitioner asks that the Federal District Court follow the Precedent that it set in its Decision made on June, 22nd of 2023 this year in Dakotans For Health V. Ewing Case # **No. 5:23-CV-05042-RAL**.

5. This case is within the same realm. The case below discusses Political Activities, Public Areas. Based on this Case and many more, the Plaintiff hereby asks for this Court to issue a temporary a permanent injunction ordering that the State of South Dakota Drop All criminal charges and that "the Court issue relief in all possible forms possible" by preventing the State Circuit Court from Moving Forward. The Petitioner asks the State Circuit Court for a Temporary Injunction and a Permanent Injunction. The Petitioner also asks that the Court set a hearing for a Permanent Injunction shall it deny the temporary injunction.

6. Included below are the following cases. Reed V Gilbert 2015 US Supreme Court.

7. Also, included below is Bible Watchtower Society V. Village of Stratton 2002 US Supreme Court

8. "Wherefore", Petitioner hereby asks for a hearing on whether a permanent injunction shall issue and asks this court to issue a temporary injunction.

**DAKOTANS FOR HEALTH, RICK WEILAND, ADAM WEILAND, Plaintiffs,**
**v.**
**BOB EWING, IN OFFICIAL CAPACITY; BRANDON FLANAGAN, IN OFFICIAL CAPACITY; RANDY DEIBERT, IN OFFICIAL CAPACITY; RICHARD SLEEP, IN OFFICIAL CAPACITY; ERIC JENNINGS, IN OFFICIAL CAPACITY; AND LAWRENCE COUNTY COMMISSIONERS, IN OFFICIAL CAPACITY; Defendants.**

No. 5:23-CV-05042-RAL.

**United States District Court, D. South Dakota, Western Division.**

June 22, 2023.

# OPINION AND TEMPORARY RESTRAINING ORDER

ROBERTO A. LANGE, Chief District Judge.

Plaintiffs Dakotans for Health, Rick Weiland, and Adam Weiland (Plaintiffs) have asked this Court to immediately restrain Lawrence County Commissioners from enforcing or threatening to enforce a Lawrence County Policy restricting ballot petition circulators to a designated area outside Lawrence County government buildings in Deadwood, South Dakota. The First Amendment to the United States Constitution, made applicable to South Dakota through the Fourteenth Amendment, prohibits the government from making laws that "abridge the freedom of speech, or of the press; or the right of people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I. For the reasons discussed below, this Court grants to a limited extent Plaintiffs' motion for a temporary restraining order.

# I. Background

On Tuesday, June 20, 2023,[1] Plaintiffs sued Defendants Lawrence County Commissioners Bob Ewing, Brandon Flanagan, Randy Deibert, Richard Sleep, and Eric Jennings (collectively Defendants or Lawrence County Commissioners) in their official capacities as Lawrence County Commissioners seeking a temporary restraining order, preliminary and permanent injunctive relief, attorney's fees and costs, and invoking federal jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(3). Doc. 1. The Complaint pleads one cause of action (entitled "Unconstitutional Restriction of Core Political Speech") asking this Court to declare the Lawrence County Political Activity Policy (the Policy) an unconstitutional restriction on Plaintiffs' right to engage in core political speech. Id. at ¶¶ 22-29. Plaintiffs' Motion for Temporary Restraining Order, Doc. 2, four supporting declarations, Docs. 3-6, and brief in support of their motion, Doc. 7, request an order under Federal Rule of Civil Procedure 65(b) immediately restraining Defendants from enforcing or threatening to enforce the Policy and waiving any bond requirement.

As this Court remarked recently in a case with identical Plaintiffs and similar legal issues, on an ex parte motion for temporary restraining order under Rule 65(b), a court should be cautious not to make any factual conclusions. See Dakotans for Health v. Anderson, 4:23-CV-04075-RAL, Doc. 10 at 2. Although the facts here differ from those in Dakotans for Health v. Anderson, the issues and analysis are similar.

Plaintiff Dakotans for Health is a South Dakota ballot question committee, Plaintiff Rick Weiland is its chair, and Plaintiff Adam Weiland works for the entity and helps manage it. Doc. 1 ¶¶ 1-4. Plaintiffs drafted and are involved in circulating petitions to place measures on the November 2024 ballot in South Dakota that, as they put it, "would allow the people of South Dakota to choose to restore their Roe v. Wade rights, and to eliminate the state sales tax on food." Doc. 1 ¶ 9. Plaintiffs employ volunteer and paid circulators to circulate their petitions and obtain signatures from registered voters to qualify the measures for the ballot. Id. ¶ 10. This lawsuit concerns Plaintiffs' petition circulation activities around Lawrence County government buildings located in the county seat of Deadwood, South Dakota. Id. ¶ 14. Deadwood—famous for its history as a gold mining settlement in the nineteenth century and scenic location in the Black Hills—is heavily trafficked by tourists each year and is the situs of many government services for the broader Lawrence County population of approximately 27,000 people.

According to Plaintiffs, the Lawrence County Courthouse and Administrative Annex buildings (referred to as "the Lawrence County Campus" or "the Campus") in Deadwood have historically been where their circulators station themselves to engage with potential petition signers and discuss political issues. Doc. 3 ¶ 7; Doc. 4 ¶ 12. The Campus (specifically the Annex building) houses the offices of the County Treasurer, Auditor, Commissioners, Public Assistance, Equalization, Planning and Zoning, Register of Deeds, Computer Department, State's Attorney, and Public Defender. Doc. 1 ¶ 17. Plaintiffs view the Campus as an ideal place to collect signatures because "[m]ore voters use the [Lawrence County Campus] than any other public building in Lawrence County." Doc. 1 ¶¶ 12-13. Plaintiffs' lawsuit maintains that while the Lawrence County Campus is an "excellent location[] at which to collect signatures to place an initiated measures the ballot," the Lawrence County Commission adopted a resolution on March

10, 2020, restricting where petition circulators are allowed on the Campus that unconstitutionally interferes with their political activities there. Doc. 1 ¶¶ 13, 24.

Resolution #2020-09 (attached to the Complaint as Exhibit 1) contains the challenged Policy and its justification. Doc. 1-1 at 1-2. The justification section of the Policy reads:

> The Lawrence County Commission has approved the following political activity policy. All petition circulators shall abide by the policy while circulating petitions on the Lawrence County campus.
>
> Lawrence County buildings are public facilities that exist to accommodate the business of the county government and the courts. In an effort to preserve public safety and provide citizens the opportunity to conduct business without unnecessary disruption or inconvenience, circulators of petitions may use the specifically designated area at the selected facility on the Lawrence County Campus to gather signatures.

Id. at 1. The Policy goes on to define "designated areas" where signature gathering is permitted on the Campus: petition circulation is permitted inside neither the Lawrence County Annex building nor the Lawrence County Courthouse and is limited to the outdoor "plaza area" between those two buildings. Id. at 1. The Policy goes on to provide a Code of Conduct for petition circulators:

> Petition Circulators are notified:
>
> &frarr; A circulator may approach persons for the purpose of politely asking for a petition signature, provided the circulator is within the prescribed area referenced in this Policy;
>
> &frarr; A circulator may engage in discussion, but shall not verbally or physically harass, threaten or intimidate any person for any reason;
>
> &frarr; A circulator shall respect the right of a person to decline to sign a petition;
>
> &frarr; A circulator shall not at any time prevent or interfere with ingress/egress of any person to or from a County building; and
>
> &frarr; A circulator may not use any County equipment, supplies or services when gathering Signatures
>
> **Failure to abide by the terms of the above described Code of Conduct shall result in the circulator being asked to leave the County premises. Further, failure to abide by the terms of the Code of Conduct may result in removal and/or arrest by law enforcement

Id. at 2.

According to the Plaintiffs, the Policy prohibits petition circulation in and on *all* sidewalks in front of the Administrative Annex building, which houses numerous public services, and restricts circulators to "one small, out-of-the-way area." Doc. 1 ¶ 24. They say the designated area isolates petition circulators from the parking lots to the west and south of the Annex building, away from sidewalks where "almost everyone enters and leaves the Administrative Annex Building." Doc. 7 at 5. Leah Bothamley, a petition circulator for Dakotans for Health, avers in

her declaration, Doc. 5, that on June 12, 2023, she was standing on the sidewalk in front of the Annex building when a woman who appeared to be a county employee approached her and handed her a copy of the Policy; Bothamley then moved to the designated area, where it was "obvious to [her] that this would be a much poorer location from which to attempt to obtain petition signatures." Doc. 5 ¶ 2-5. In Plaintiffs' view, Defendants' Policy restricting their petition circulators to the outdoor plaza in between the two buildings on the Campus makes them significantly less effective at gathering signatures and unconstitutionally infringes on their First Amendment rights. Doc. 4 ¶ 12; Doc. 7 at 14.

Plaintiffs' Complaint attached a screenshot from Google Maps of the area of the entrance commonly used by the public to enter the Administrative Annex building. Doc. 1-4. This Court, rather than relying on this single image and to better educate itself on the physical characteristics of the area around the Lawrence County Campus, used Google Maps to view its depiction of the entire Campus. This Court ultimately will want input from the parties on whether Google Map images are sufficiently reliable to use in place of personally viewing the premises but wants to be transparent with the parties on information this Court has accessed in ruling on the motion for temporary restraining order. The images show that the County Campus is surrounded by what appears to be a wraparound public sidewalk that lies parallel and perpendicular to Center Street, Sherman Street, and Pine Street. The sidewalk appears to provide access not only to the County Campus buildings, the outdoor plaza, and what Plaintiffs say is the most used south entrance to the Annex building, but also to a parking lot and parking garage where this Court assumes the public may park to access the Campus or downtown Deadwood in general. Defendants' Policy thus appears to remove public sidewalks from petition circulation activity and confine that activity to the outdoor plaza. The outdoor plaza looks to be a nice area for a gathering or group protest, but removes petition circulators from where they would or could approach pedestrians on public sidewalks adjacent to county buildings. The policy on initial blush appears to be overly restrictive and prevents petition circulators from peacefully exercising their First Amendment rights to which they are entitled on public or traditionally public forums around this kind of government property.

## II. Legal Standard

Rule 65 of the Federal Rules of Civil Procedure provides as follows:

(b) Temporary Restraining Order.

(1) *Issuing Without Notice.* The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

(2) *Contents; Expiration.* Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order

was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.

(3) *Expediting the Preliminary-Injunction Hearing.* If the order is issued without notice, the motion for a preliminary injunction must be set for hearing at the earliest possible time, taking precedence over all other matters except hearings on older matters of the same character. At the hearing, the party who obtained the order must proceed with the motion; if the party does not, the court must dissolve the order.

(4) *Motion to Dissolve.* On 2 days' notice to the party who obtained the order without notice—or on shorter notice set by the court—the adverse party may appear and move to dissolve or modify the order. The court must then hear and decide the motion as promptly as justice requires.

"A district court considering injunctive relief evaluates [a] the movant's likelihood of success on the merits, [b] the threat of irreparable harm to the movant, [c] the balance of the equities between the parties, and [d] whether an injunction is in the public interest." Powell v. Ryan, 855 F.3d 899, 902 (8th Cir. 2017) (citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). "No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue. However, in deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant." Turtle Island Foods, SPC v. Thompson, 992 F.3d 694, 699 (8th Cir. 2021) (cleaned up and citations omitted).

The focus in considering a temporary restraining order is whether the moving party "clearly show[s] that immediate and irreparable injury, loss or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). Although the Dataphase factors do not apply under the language of the rule to the decision to grant a temporary restraining order, this Court will consider each Dataphase factor here, with a particular focus on the first and second factors.

# III. Discussion

## A. The movant's likelihood of success on the merits

The First Amendment prohibits the government from "abridging the freedom of speech ... and to petition the Government." U.S. Const. amend. I. Thomas Jefferson, whose face adorns a mountainside not far from Deadwood, recognized that "public discussion is a political duty" and a "fundamental principle of the American government." Whitney v. California, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring). That principle, enshrined in the First Amendment and valued by South Dakota since 1898 when it became the first state to give ordinary citizens the power to initiate laws through the popular vote, protects the right of petition circulators to reasonably engage in public discussion outside of government buildings.

The First Amendment's protection is "at its zenith" when "core political speech" like petition circulation is involved. U.S. Const. amend. I; Buckley v. Am. Const. L. Found., 525 U.S. 182, 186-87 (1999) (cleaned up and citation omitted)). The question here is how this protection

applies when the petition circulation occurs on or adjacent to government property, here on or adjacent to the Lawrence County Campus. Like a private property owner, the government "has the power to preserve the property under its control for the use to which it is lawfully dedicated." United States v. Grace, 461 U.S. 171, 178 (1983) (cleaned up and citation omitted). The First Amendment does not require the government to "freely ... grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 799-800 (1985). Instead, the government's ability to limit free speech on its property depends on the "nature of the forum" in which the free speech occurs. Id. at 800; Ball v. City of Lincoln, 870 F.3d 722, 729 (8th Cir. 2017).

The government's authority to limit speech is at its lowest in traditional public forums like public streets, parks, and sidewalks. See Grace, 461 U.S. at 177 (noting that "streets, sidewalks, and parks, are considered, without more, to be public forums" and that government authority to restrict speech in these areas "is very limited") (cleaned up and citation omitted)); Schenck v. ProChoice Network of W.N.Y., 519 U.S. 357, 377 (1997) ("[S]peech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum."). The government may impose reasonable time, place, and manner restrictions in public forums, but only if those restrictions are content neutral,[2] "narrowly tailored to serve a significant governmental interest," and "leave open ample alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (cleaned up and citation omitted). This same test applies to designated public forums, which are created when the government "intentionally open[s] a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802; Pleasant Grove City v. Summum, 555 U.S. 460, 469-70 (2009) (explaining that the same standard governs restrictions on speech in public forums and designated public forums).

The government has more leeway to regulate speech in nonpublic forums, meaning "government property that is not by tradition or designation a forum for expressive activities by the public." Ball v. City of Lincoln, 870 F.3d 722, 730 (8th Cir. 2017) (cleaned up and citation omitted). Restrictions on speech in a nonpublic forum pass muster so long as they are "reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." Cornelius, 473 U.S. at 800 (cleaned up and citation omitted). These restrictions "'need not be the most reasonable or the only reasonable limitation' to be constitutionally permissible." Ball, 870 F.3d at 730 (quoting United States v. Kokinda, 497 U.S. 720, 730 (1990)).

Because the nature of the forum prescribes the level of constitutional protection, this Court must consider whether the sidewalk outside the Lawrence County Campus is a public or nonpublic forum. Public streets and sidewalks "occupy a special position in terms of First Amendment protection because of their historic role as sites for discussion and debate." McCullen v. Coakley, 573 U.S. 464, 476 (2014) (cleaned up and citation omitted). Public sidewalks are critical to the "exchange of ideas" because they provide access to people who might otherwise ignore the speaker's message. Id. Some sidewalks present easy questions concerning their forum status. In Grace, for instance, the Supreme Court held that the sidewalks "comprising the outer boundaries" of the Supreme Court grounds were a public forum. 461 U.S. at 179. These sidewalks were "indistinguishable from any other sidewalks in Washington, D.C.," and there was "no separation,

no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." Id. As such, the Supreme Court saw "no reason why [these sidewalks] should be treated any differently" than traditional sidewalks, which are "considered, generally without further inquiry, to be public forum property." Id. at 179.

A public sidewalk running along Center, Sherman, and Pine streets surrounds the Lawrence County Campus. The petition circulator for Dakotans for Health was standing on a public sidewalk in front of the Annex building when a woman who appeared to be a county employee approached her with the Policy on June 12, 2023, directing her to move to the designated area in the plaza area. If the Policy in fact is read to place off-limits petition circulation on public sidewalks, then Defendants appear to be restricting First Amendment activity in a public forum.

Because the sidewalk outside of the Annex building appears to be a public forum, the policy to be constitutional must be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." Ward, 491 U.S. at 791 (cleaned up and citation omitted). The "narrow tailoring requirement means not only that the regulation must promote a substantial government interest that would be achieved less effectively absent the regulation, but also that the factual situation demonstrates a real need for the government to act to protect its interests." Johnson v. Minneapolis Park & Recreation Bd., 729 F.3d 1094, 1099 (8th Cir. 2013) (cleaned up and citations omitted). The protected interest cannot be abstract, and instead "there must be a genuine nexus between the regulation and the interest it seeks to serve." Id.

The Supreme Court made clear in McCullen v. Coakley that the "government still may not regulate expression in such manner that a substantial portion of the burden on speech does not serve to advance its goals." 573 U.S. at 486 (cleaned up and citation omitted). McCullen involved a Massachusetts statute that prohibited people from knowingly standing on a public walkway or sidewalk within 35 feet of an entrance or driveway to an abortion clinic. Id. at 469. The plaintiffs were anti-abortion advocates who engaged in "sidewalk counseling" by offering women approaching the clinics information about alternatives to abortion and trying to dissuade them from terminating their pregnancies. Id. at 472-73. The plaintiffs' sidewalk counseling strategy involved quiet, individualized conversations with the women, as they believed this approach was far more effective than more confrontational methods like yelling or waiving signs. Id. at 473. The plaintiffs claimed that the Massachusetts statute's creation of buffer zones around the clinics significantly hindered their ability to pass out literature and engage in face-to-face conversations. Id. at 474.

The Supreme Court held that the statute was not narrowly tailored because it burdened substantially more speech than was necessary to further Massachusetts' legitimate interest in "public safety, patient access to healthcare, and the unobstructed use of public sidewalks." Id. at 486. The statute's main failure, the Court explained, was its significant burden on the plaintiffs' sidewalk counseling:

[T]he buffer zones impose serious burdens on petitioners' speech. At each of the three Planned Parenthood clinics where petitioners attempt to counsel patients, the zones carve out a significant

portion of the adjacent public sidewalks, pushing petitioners well back from the clinics' entrances and driveways. The zones thereby compromise petitioners' ability to initiate the close, personal conversations that they deem essential to "sidewalk counseling."

Id. at 487. These buffer zones likewise "made it substantially more difficult for petitioners to distribute literature to arriving patients." Id. at 488. The Court rejected Massachusetts' attempt to downplay these burdens, explaining that the government "imposes an especially significant First Amendment burden" when it frustrates methods of communication like leafleting and personal conversations. Id. at 489.

As for the narrowly tailored analysis, the Court concluded that Massachusetts "too readily for[went] options that could have" accomplished its interests without substantially burdening the plaintiffs' speech. Id. at 490. The Court noted multiple less burdensome alternatives, including another statute that already criminalized much of the conduct Massachusetts sought to prevent, statutes from other jurisdictions, and the enforcement of existing local ordinances. Id. at 490-94. It was "not enough," the Court explained, that the buffer zones would have made it easier to accomplish the state's goals. Id. at 495. Rather, the state needed to "demonstrate that alternative measures that burdened substantially less speech would fail to achieve the government's interests." Id.; see also id. ("A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency.").

"In the context of petition campaigns, [the Supreme Court has] observed that 'one-on-one communication' is 'the most effective, fundamental, and perhaps economical avenue of political discourse.'" McCullen, 573 U.S. at 488 (quoting Meyer v. Grant, 486 U.S. 414, 424 (1988)). "When the government makes it more difficult to engage in [this] mode of communication, it imposes an especially significant First Amendment burden." Id. at 489. Defendants' Policy appears to hamstring the Plaintiffs' chosen method of communication by requiring them to remain in a plaza apart from pedestrian traffic into the Lawrence County Annex building; the plaza is on the opposite side from what appears to be the common entrance to the Annex building and a petition circulator would have to call out to those passing on sidewalks. See id. ("It is easier to ignore a strained voice or a waiving hand than a direct greeting or an outstretched arm.").

Requiring petition circulators to remain in the designated areas also burdens substantially more speech than necessary to achieve Defendants' interests expressed in the Policy's justification. This Court only has the language of the Policy itself—that is, "to preserve public safety and provide citizens the opportunity to conduct business without unnecessary disruption or inconvenience"—to understand the justification for the Policy. Preserving public safety and allowing citizens to conduct business with the county without unnecessary disruption or inconvenience are worthy and strong governmental interests. These justifications, however, do not explain in any meaningful way why petition circulators must be taken off a public sidewalk and placed in a plaza area away from pedestrian traffic. There appears to be ample space in and along the public sidewalks around the building and main County Campus entrance for petition circulators to stand without obstructing pedestrian traffic into or around the buildings. Indeed, there even appears to be a bench for people to sit and a cigarette disposal container immediately outside the Annex building entrance. If there is room for people to sit and smoke on the public

sidewalk right next to the most used entrance to the County Annex building, Plaintiffs are likely to succeed on the merits of their claim that there is ample room for exercising fundamental First Amendment rights in that space, too. The other portions of the Policy may address the Defendants' concern without imposing a significant burden on Plaintiffs' method of communication. In short, if the Defendants' Policy was meant to put the public sidewalks off limits to petition circulators and confine them to the plaza area, it does not appear to be sufficiently narrowly tailored to withstand a constitutional challenge.

## B. The threat of irreparable harm to the movant

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009). "In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Novus Franchising, Inc. v. Dawson, 725 F.3d 885, 895 (8th Cir. 2013) (citation omitted). The irreparable nature of the harm stemming from First Amendment violations is well-recognized. Powell v. Noble, 798 F.3d 690, 702 (8th Cir. 2015) (quoting Marcus v. Pub. Television, 97 F.3d 1137, 1140 (8th Cir. 1996)) ("If [the Plaintiffs] are correct and their First Amendment rights have been violated, this constitutes an irreparable harm." (citation omitted)).

Unlike in Anderson, Plaintiffs here challenge a policy that has been in place for more than three years. "Without question, `[a] long delay by plaintiff after learning of the threatened harm ... may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.'" Adventist Health System/SunBelt, Inc. v. U.S. Dept. of Health & Human Servs., 17 F.4th 793, 805 (8th Cir. 2021) (quoting Wright & Miller, 11A Fed. Prac. & Proc., § 2948.1 & n.13 (3d ed. 2013)). Because of the delay, Plaintiffs here may have to clear a hurdle that was not present in Anderson, where the lawsuit was brought mere days after the challenged policy went into effect. On the other hand, the Bothamley Declaration shows Plaintiffs suffered a harm as recently June 12, 2023, Doc. 5, and perhaps that was the first time the policy has been enforced directly to the detriment of Plaintiffs. This case presents a closer call on irreparable harm than in Anderson. Because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," this factor weighs somewhat in favor of temporary and immediate relief. Elrod v. Burns, 427 U.S. 347, 373 (1976).

## C. The balance of equities between the parties

Plaintiffs have demonstrated that as recently as June 12, 2023, they have suffered what appears to be action undermining their fundamental First Amendment rights. Plaintiffs do not appear to challenge the "Code of Conduct" portion of the policy, nor in all likelihood could they, so restraining enforcement of the designated area portion of the policy is unlikely to harm Defendants. That is, even if Plaintiffs are allowed to conduct their activities outside of the currently designated area, the requirements that they do so politely and without interfering with ingress or egress of any person to or from a County building should protect Defendants from

harm in the interim. The balance of equities or balance of harms analysis seems to favor Plaintiffs.

## D. Whether an injunction is in the public interest

"When the ... government or agency is the defendant, the final two factors [i.e. the balance of equities between the parties and whether an injunction is in the public interest] can `merge' into one." Noem v. Haaland, 542 F. Supp. 3d 898, 925 (D.S.D. 2021) (cleaned up and citation omitted); see also Nken v. Holder, 556 U.S. 418, 435 (2009) (stating the same). "The public interest generally is served by allowing the free exercise of First Amendment rights." Blue State Refugees v. Noem, No. 3:21-CV-3024-RAL, 2021 WL 5150358, at *4 (D.S.D. Nov. 5, 2021). The public has an interest to enter and leave county buildings without undue traffic flow problems that petition circulators might create. Especially given the Policy's Code of Conduct, there is nothing to suggest that pedestrian traffic flow is, has, or could be a serious issue here if Plaintiffs are allowed to exercise their First Amendment rights elsewhere from the public sidewalks and not just from the designated area on the outdoor plaza.

## E. Bond

Under Rule 65(c), a temporary restraining order should issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A temporary restraining order as sought by Plaintiffs does not cause Defendants to incur "costs and damages" apart from the costs of defending this suit generally, which do not increase through entry of a temporary restraining order. The bond requirement may properly be waived in public interest litigation. Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs, 826 F.3d 1030, 1043 (8th Cir. 2018).

## IV. Conclusion and Order

For the reasons explained, it is

ORDERED that Plaintiffs' Motion for Temporary Restraining Order with Notice, Doc. 2, is granted to the limited extent that Defendants may not enforce or threaten to enforce the portion of the Lawrence County Political Activity Policy that restricts petition circulation to the designated area in the plaza area located between the Lawrence County Administrative Annex building and the Lawrence County Courthouse. Defendants may otherwise enforce provisions of the Policy. It is further

ORDERED that the parties cooperate with this Court to set an evidentiary hearing on the motion for preliminary injunction. It is further

ORDERED that this order shall remain in place for no more than 14 days and that the parties cooperate in setting a preliminary injunction hearing at the earliest possible time before this Court. It is finally

ORDERED that the bond requirement is waived.

[1] The case was reassigned to the undersigned judge yesterday.

[2] Defendants' Policy appears to be content-neutral. Of course:

Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests. Courts will apply a strict scrutiny analysis when the regulation discriminates on the basis of content, and a more lenient analysis to content-neutral regulations.

Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks, 864 F.3d 905, 913-14 (8th Cir. 2017) (cleaned up and citations omitted).


### 135 S.Ct. 2218 (2015)

## Clyde REED, et al., Petitioners
## v.
## TOWN OF GILBERT, ARIZONA, et al.

### No. 13-502.

### Supreme Court of United States.

Argued January 12, 2015.
Decided June 18, 2015.

2223*2223 David A. Coltman, Lawrenceville, GA, for Petitioners.

2224*2224 Eric J. Feigin, Washington, DC, for the United States as amicus curiae, by special leave of the Court, supporting neither party.

Philip W. Savrin, Atlanta, GA, for Respondents.

Kevin H. Theriot, Jeremy D. Tedesco, Alliance Defending Freedom, Scottsdale, AZ, David A. Cortman, Counsel of Record, Rory T. Gray, Alliance Defending Freedom, Lawrenceville, GA, for Petitioner.

Philip W. Savrin, Counsel of Record, Dana K. Maine, William H. Buechner, Jr., Freeman Mathis & Gary, LLP, Atlanta, GA, for Respondents.

Justice THOMAS delivered the opinion of the Court.

The town of Gilbert, Arizona (or Town), has adopted a comprehensive code governing the manner in which people may display outdoor signs. Gilbert, Ariz., Land Development Code (Sign Code or Code), ch. 1, § 4.402 (2005).[1] The Sign Code identifies various categories of

signs based on the type of information they convey, then subjects each category to different restrictions. One of the categories is "Temporary Directional Signs Relating to a Qualifying Event," loosely defined as signs directing the public to a meeting of a nonprofit group. § 4.402(P). The Code imposes more stringent restrictions on these signs than it does on signs conveying other messages. We hold that these provisions are content-based regulations of speech that cannot survive strict scrutiny.

# I

# A

The Sign Code prohibits the display of outdoor signs anywhere within the Town without a permit, but it then exempts 23 categories of signs from that requirement. These exemptions include everything from bazaar signs to flying banners. Three categories of exempt signs are particularly relevant here.

The first is "Ideological Sign[s]." This category includes any "sign communicating a message or ideas for noncommercial purposes that is not a Construction Sign, Directional Sign, Temporary Directional Sign Relating to a Qualifying Event, Political Sign, Garage Sale Sign, or a sign owned or required by a governmental agency." Sign Code, Glossary of General Terms (Glossary), p. 23 (emphasis deleted). Of the three categories discussed here, the Code treats ideological signs most favorably, allowing them to be up to 20 square feet in area and to be placed in all "zoning districts" without time limits. § 4.402(J).

The second category is "Political Sign[s]." This includes any "temporary sign designed to influence the outcome of an election called by a public body." Glossary 23.[2] The Code treats these signs less favorably than ideological signs. The Code allows the placement of political signs up to 16 square feet on residential property and up to 32 square feet on non-residential property, undeveloped municipal property, and "rights-of-way." 2225*2225 § 4.402(I).[3] These signs may be displayed up to 60 days before a primary election and up to 15 days following a general election. *Ibid.*

The third category is "Temporary Directional Signs Relating to a Qualifying Event." This includes any "Temporary Sign intended to direct pedestrians, motorists, and other passersby to a `qualifying event.'" Glossary 25 (emphasis deleted). A "qualifying event" is defined as any "assembly, gathering, activity, or meeting sponsored, arranged, or promoted by a religious, charitable, community service, educational, or other similar non-profit organization." *Ibid.* The Code treats temporary directional signs even less favorably than political signs.[4] Temporary directional signs may be no larger than six square feet. § 4.402(P). They may be placed on private property or on a public right-of-way, but no more than four signs may be placed on a single property at any time. *Ibid.* And, they may be displayed no more than 12 hours before the "qualifying event" and no more than 1 hour afterward. *Ibid.*

# B

Petitioners Good News Community Church (Church) and its pastor, Clyde Reed, wish to advertise the time and location of their Sunday church services. The Church is a small, cash-strapped entity that owns no building, so it holds its services at elementary schools or other locations in or near the Town. In order to inform the public about its services, which are held in a variety of different locations, the Church began placing 15 to 20 temporary signs around the Town, frequently in the public right-of-way abutting the street. The signs typically displayed the Church's name, along with the time and location of the upcoming service. Church members would post the signs early in the day on Saturday and then remove them around midday on Sunday. The display of these signs requires little money and manpower, and thus has proved to be an economical and effective way for the Church to let the community know where its services are being held each week.

This practice caught the attention of the Town's Sign Code compliance manager, who twice cited the Church for violating the Code. The first citation noted that the Church exceeded the time limits for displaying its temporary directional signs. The second citation referred to the same problem, along with the Church's failure to include the date of the event on the signs. Town officials even confiscated one of the Church's signs, which Reed had to retrieve from the municipal offices.

Reed contacted the Sign Code Compliance Department in an attempt to reach an accommodation. His efforts proved unsuccessful. The Town's Code compliance manager informed the Church that there 2226*2226 would be "no leniency under the Code" and promised to punish any future violations.

Shortly thereafter, petitioners filed a complaint in the United States District Court for the District of Arizona, arguing that the Sign Code abridged their freedom of speech in violation of the First and Fourteenth Amendments. The District Court denied the petitioners' motion for a preliminary injunction. The Court of Appeals for the Ninth Circuit affirmed, holding that the Sign Code's provision regulating temporary directional signs did not regulate speech on the basis of content. 587 F.3d 966, 979 (2009). It reasoned that, even though an enforcement officer would have to read the sign to determine what provisions of the Sign Code applied to it, the "'kind of cursory examination'" that would be necessary for an officer to classify it as a temporary directional sign was "not akin to an officer synthesizing the expressive content of the sign." *Id.,* at 978. It then remanded for the District Court to determine in the first instance whether the Sign Code's distinctions among temporary directional signs, political signs, and ideological signs nevertheless constituted a content-based regulation of speech.

On remand, the District Court granted summary judgment in favor of the Town. The Court of Appeals again affirmed, holding that the Code's sign categories were content neutral. The court concluded that "the distinctions between Temporary Directional Signs, Ideological Signs, and Political Signs . . . are based on objective factors relevant to Gilbert's creation of the specific exemption from the permit requirement and do not otherwise consider the substance of the sign." 707 F.3d 1057, 1069 (C.A.9 2013). Relying on this Court's decision in *Hill v. Colorado,* 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000), the Court of Appeals concluded that the Sign Code is content neutral. 707 F.3d, at 1071-1072. As the court explained, "Gilbert did not adopt its regulation of speech because it disagreed with the message conveyed" and its "interests in regulat[ing] temporary signs are unrelated to the

content of the sign." *Ibid.* Accordingly, the court believed that the Code was "contentneutral as that term [has been] defined by the Supreme Court." *Id.,* at 1071. In light of that determination, it applied a lower level of scrutiny to the Sign Code and concluded that the law did not violate the First Amendment. *Id.,* at 1073-1076.

We granted certiorari, 573 U.S. ___, 134 S.Ct. 2900, 189 L.Ed.2d 854 (2014), and now reverse.

# II

# A

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws "abridging the freedom of speech." U.S. Const., Amdt. 1. Under that Clause, a government, including a municipal government vested with state authority, "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests. *R.A.V. v. St. Paul,* 505 U.S. 377, 395, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 115, 118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991).

2227*2227 Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. *E.g., Sorrell v. IMS Health, Inc.,* 564 U.S. ___, ___-___, 131 S.Ct. 2653, 2663-2664, 180 L.Ed.2d 544 (2011); *Carey v. Brown,* 447 U.S. 455, 462, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); *Mosley, supra,* at 95, 92 S.Ct. 2286. This commonsense meaning of the phrase "content based" requires a court to consider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys. *Sorrell, supra,* at ___, 131 S.Ct., at 2664. Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.

Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be "'justified without reference to the content of the regulated speech,'" or that were adopted by the government "because of disagreement with the message [the speech] conveys," *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Those laws, like those that are content based on their face, must also satisfy strict scrutiny.

# B

The Town's Sign Code is content based on its face. It defines "Temporary Directional Signs" on the basis of whether a sign conveys the message of directing the public to church or some other "qualifying event." Glossary 25. It defines "Political Signs" on the basis of whether a sign's message is "designed to influence the outcome of an election." *Id.,* at 24. And it defines "Ideological Signs" on the basis of whether a sign "communicat[es] a message or ideas" that do not fit within the Code's other categories. *Id.,* at 23. It then subjects each of these categories to different restrictions.

The restrictions in the Sign Code that apply to any given sign thus depend entirely on the communicative content of the sign. If a sign informs its reader of the time and place a book club will discuss John Locke's Two Treatises of Government, that sign will be treated differently from a sign expressing the view that one should vote for one of Locke's followers in an upcoming election, and both signs will be treated differently from a sign expressing an ideological view rooted in Locke's theory of government. More to the point, the Church's signs inviting people to attend its worship services are treated differently from signs conveying other types of ideas. On its face, the Sign Code is a content-based regulation of speech. We thus have no need to consider the government's justifications or purposes for enacting the Code to determine whether it is subject to strict scrutiny.

## C

In reaching the contrary conclusion, the Court of Appeals offered several theories to explain why the Town's Sign Code should be deemed content neutral. None is persuasive.

## 1

The Court of Appeals first determined that the Sign Code was content neutral because the Town "did not adopt its regulation of speech [based on] disagree[ment] with the message conveyed," and its justifications for regulating temporary directional signs were "unrelated to the content of the sign." 707 F.3d, at 1071-1072. 2228*2228 In its brief to this Court, the United States similarly contends that a sign regulation is content neutral—even if it expressly draws distinctions based on the sign's communicative content—if those distinctions can be "'justified without reference to the content of the regulated speech.'" Brief for United States as *Amicus Curiae* 20, 24 (quoting *Ward, supra,* at 791, 109 S.Ct. 2746; emphasis deleted).

But this analysis skips the crucial first step in the content-neutrality analysis: determining whether the law is content neutral on its face. A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of "animus toward the ideas contained" in the regulated speech. *Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 429, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). We have thus made clear that "'[i]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment,'" and a party opposing the government "need adduce `no evidence of an improper censorial motive.'" *Simon & Schuster, supra,* at 117, 112 S.Ct. 501. Although "a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary." *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497

(1994). In other words, an innocuous justification cannot transform a facially content-based law into one that is content neutral.

That is why we have repeatedly considered whether a law is content neutral on its face *before* turning to the law's justification or purpose. See, *e.g., Sorrell, supra,* at ___-___, 131 S.Ct., at 2663-2664 (statute was content based "on its face," and there was also evidence of an impermissible legislative motive); *United States v. Eichman,* 496 U.S. 310, 315, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990) ("Although the [statute] contains no explicit content-based limitation on the scope of prohibited conduct, it is nevertheless clear that the Government's asserted *interest* is related to the suppression of free expression" (internal quotation marks omitted)); *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) ("The text of the ordinance is neutral," and "there is not even a hint of bias or censorship in the City's enactment or enforcement of this ordinance"); *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (requiring that a facially content-neutral ban on camping must be "justified without reference to the content of the regulated speech"); *United States v. O'Brien,* 391 U.S. 367, 375, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (noting that the statute "on its face deals with conduct having no connection with speech," but examining whether the "the governmental interest is unrelated to the suppression of free expression"). Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny.

The Court of Appeals and the United States misunderstand our decision in *Ward* as suggesting that a government's purpose is relevant even when a law is content based on its face. That is incorrect. *Ward* had nothing to say about facially content-based restrictions because it involved a facially content-*neutral* ban on the use, in a city-owned music venue, of sound amplification systems not provided by the city. 491 U.S., at 787, and n. 2, 109 S.Ct. 2746. In that context, we looked to 2229*2229 governmental motive, including whether the government had regulated speech "because of disagreement" with its message, and whether the regulation was "'justified without reference to the content of the speech.'" *Id.,* at 791, 109 S.Ct. 2746. But *Ward's* framework "applies only if a statute is content neutral." *Hill,* 530 U.S., at 766, 120 S.Ct. 2480 (KENNEDY, J., dissenting). Its rules thus operate "to protect speech," not "to restrict it." *Id.,* at 765, 120 S.Ct. 2480.

The First Amendment requires no less. Innocent motives do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech. That is why the First Amendment expressly targets the operation of the laws—*i.e.,* the "abridg[ement] of speech"—rather than merely the motives of those who enacted them. U.S. Const., Amdt. 1. "'The vice of content-based legislation . . . is not that it is always used for invidious, thought-control purposes, but that it lends itself to use for those purposes.'" *Hill, supra,* at 743, 120 S.Ct. 2480 (SCALIA, J., dissenting).

For instance, in *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), the Court encountered a State's attempt to use a statute prohibiting "'improper solicitation'." by attorneys to out-law litigation-related speech of the National Association for the

Advancement of Colored People. *Id.,* at 438, 83 S.Ct. 328. Although *Button* predated our more recent formulations of strict scrutiny, the Court rightly rejected the State's claim that its interest in the "regulation of professional conduct" rendered the statute consistent with the First Amendment, observing that "it is no answer . . . to say. . . that the purpose of these regulations was merely to insure high professional standards and not to curtail free expression." *Id.,* at 438-439, 83 S.Ct. 328. Likewise, one could easily imagine a Sign Code compliance manager who disliked the Church's substantive teachings deploying the Sign Code to make it more difficult for the Church to inform the public of the location of its services. Accordingly, we have repeatedly "rejected the argument that `discriminatory . . . treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas.'" <u>Discovery Network, 507 U.S., at 429, 113 S.Ct. 1505</u>. We do so again today.

## 2

The Court of Appeals next reasoned that the Sign Code was content neutral because it "does not mention any idea or viewpoint, let alone single one out for differential treatment." 587 F.3d, at 977. It reasoned that, for the purpose of the Code provisions, "[i]t makes no difference which candidate is supported, who sponsors the event, or what ideological perspective is asserted." 707 F.3d, at 1069.

The Town seizes on this reasoning, insisting that "content based" is a term of art that "should be applied flexibly" with the goal of protecting "viewpoints and ideas from government censorship or favoritism." Brief for Respondents 22. In the Town's view, a sign regulation that "does not censor or favor particular viewpoints or ideas" cannot be content based. *Ibid.* The Sign Code allegedly passes this test because its treatment of temporary directional signs does not raise any concerns that the government is "endorsing or suppressing `ideas or viewpoints,'" *id.,* at 27, and the provisions for political signs and ideological signs "are neutral as to particular ideas or viewpoints" within those categories. *Id.,* at 37.

This analysis conflates two distinct but related limitations that the First 2230*2230 Amendment places on government regulation of speech. Government discrimination among viewpoints—or the regulation of speech based on "the specific motivating ideology or the opinion or perspective of the speaker"—is a "more blatant" and "egregious form of content discrimination." <u>Rosenberger v. Rector and Visitors of Univ. of Va.,</u> 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). But it is well established that "[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." <u>Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.,</u> 447 U.S. 530, 537, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980).

Thus, a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter. *Ibid.* For example, a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed. See <u>Discovery Network, supra,</u> at 428, <u>113 S.Ct. 1505</u>. The Town's Sign Code likewise singles out specific subject matter for differential treatment, even if it does not

target viewpoints within that subject matter. Ideological messages are given more favorable treatment than messages concerning a political candidate, which are themselves given more favorable treatment than messages announcing an assembly of like-minded individuals. That is a paradigmatic example of content-based discrimination.

## 3

Finally, the Court of Appeals characterized the Sign Code's distinctions as turning on "'the content-neutral elements of who is speaking through the sign and whether and when an event is occurring.'" 707 F.3d, at 1069. That analysis is mistaken on both factual and legal grounds.

To start, the Sign Code's distinctions are not speaker based. The restrictions for political, ideological, and temporary event signs apply equally no matter who sponsors them. If a local business, for example, sought to put up signs advertising the Church's meetings, those signs would be subject to the same limitations as such signs placed by the Church. And if Reed had decided to display signs in support of a particular candidate, he could have made those signs far larger—and kept them up for far longer—than signs inviting people to attend his church services. If the Code's distinctions were truly speaker based, both types of signs would receive the same treatment.

In any case, the fact that a distinction is speaker based does not, as the Court of Appeals seemed to believe, automatically render the distinction content neutral. Because "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," _Citizens United v. Federal Election Comm'n,_ 558 U.S. 310, 340, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), we have insisted that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference," _Turner,_ 512 U.S., at 658, 114 S.Ct. 2445. Thus, a law limiting the content of newspapers, but only newspapers, could not evade strict scrutiny simply because it could be characterized as speaker based. Likewise, a content-based law that restricted the political speech of all corporations would not become content neutral just because it singled out corporations as a class of speakers. See _Citizens United, supra,_ at 340-341, 130 S.Ct. 876. Characterizing a distinction 2231*2231 as speaker based is only the beginning—not the end—of the inquiry.

Nor do the Sign Code's distinctions hinge on "whether and when an event is occurring." The Code does not permit citizens to post signs on any topic whatsoever within a set period leading up to an election, for example. Instead, come election time, it requires Town officials to determine whether a sign is "designed to influence the outcome of an election" (and thus "political") or merely "communicating a message or ideas for noncommercial purposes" (and thus "ideological"). Glossary 24. That obvious content-based inquiry does not evade strict scrutiny review simply because an event (_i.e.,_ an election) is involved.

And, just as with speaker-based laws, the fact that a distinction is event based does not render it content neutral. The Court of Appeals cited no precedent from this Court supporting its novel theory of an exception from the content-neutrality requirement for event-based laws. As we have explained, a speech regulation is content based if the law applies to particular speech because of the topic discussed or the idea or message

expressed. *Supra,* at 2226 - 2227. A regulation that targets a sign because it conveys an idea about a specific event is no less content based than a regulation that targets a sign because it conveys some other idea. Here, the Code singles out signs bearing a particular message: the time and location of a specific event. This type of ordinance may seem like a perfectly rational way to regulate signs, but a clear and firm rule governing content neutrality is an essential means of protecting the freedom of speech, even if laws that might seem "entirely reasonable" will sometimes be "struck down because of their content-based nature." *City of Ladue v. Gilleo,* 512 U.S. 43, 60, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (O'Connor, J., concurring).

# III

Because the Town's Sign Code imposes content-based restrictions on speech, those provisions can stand only if they survive strict scrutiny, "'which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest,'" *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett,* 564 U.S. ___, ___, 131 S.Ct. 2806, 2817, 180 L.Ed.2d 664 (2011) (quoting *Citizens United,* 558 U.S., at 340, 130 S.Ct. 876). Thus, it is the Town's burden to demonstrate that the Code's differentiation between temporary directional signs and other types of signs, such as political signs and ideological signs, furthers a compelling governmental interest and is narrowly tailored to that end. See *ibid.*

The Town cannot do so. It has offered only two governmental interests in support of the distinctions the Sign Code draws: preserving the Town's aesthetic appeal and traffic safety. Assuming for the sake of argument that those are compelling governmental interests, the Code's distinctions fail as hopelessly underinclusive.

Starting with the preservation of aesthetics, temporary directional signs are "no greater an eyesore," *Discovery Network,* 507 U.S., at 425, 113 S.Ct. 1505, than ideological or political ones. Yet the Code allows unlimited proliferation of larger ideological signs while strictly limiting the number, size, and duration of smaller directional ones. The Town cannot claim that placing strict limits on temporary directional signs is necessary to beautify the Town while at the same time allowing unlimited numbers of other types of signs that create the same problem.

2232*2232 The Town similarly has not shown that limiting temporary directional signs is necessary to eliminate threats to traffic safety, but that limiting other types of signs is not. The Town has offered no reason to believe that directional signs pose a greater threat to safety than do ideological or political signs. If anything, a sharply worded ideological sign seems more likely to distract a driver than a sign directing the public to a nearby church meeting.

In light of this underinclusiveness, the Town has not met its burden to prove that its Sign Code is narrowly tailored to further a compelling government interest. Because a "'law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited,'" *Republican Party of Minn. v. White,* 536 U.S. 765, 780, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), the Sign Code fails strict scrutiny.

# IV

Our decision today will not prevent governments from enacting effective sign laws. The Town asserts that an "`absolutist'" content-neutrality rule would render "virtually all distinctions in sign laws . . . subject to strict scrutiny," Brief for Respondents 34-35, but that is not the case. Not "all distinctions" are subject to strict scrutiny, only *content-based* ones are. Laws that are *content neutral* are instead subject to lesser scrutiny. See *Clark,* 468 U.S., at 295, 104 S.Ct. 3065.

The Town has ample content-neutral options available to resolve problems with safety and aesthetics. For example, its current Code regulates many aspects of signs that have nothing to do with a sign's message: size, building materials, lighting, moving parts, and portability. See, *e.g.,* §4.402(R). And on public property, the Town may go a long way toward entirely forbidding the posting of signs, so long as it does so in an evenhanded, content-neutral manner. See *Taxpayers for Vincent,* 466 U.S., at 817, 104 S.Ct. 2118 (upholding content-neutral ban against posting signs on public property). Indeed, some lower courts have long held that similar content-based sign laws receive strict scrutiny, but there is no evidence that towns in those jurisdictions have suffered catastrophic effects. See, *e.g., Solantic, LLC v. Neptune Beach,* 410 F.3d 1250, 1264-1269 (C.A.11 2005) (sign categories similar to the town of Gilbert's were content based and subject to strict scrutiny); *Matthews v. Needham,* 764 F.2d 58, 59-60 (C.A.1 1985) (law banning political signs but not commercial signs was content based and subject to strict scrutiny).

We acknowledge that a city might reasonably view the general regulation of signs as necessary because signs "take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation." *City of Ladue,* 512 U.S., at 48, 114 S.Ct. 2038. At the same time, the presence of certain signs may be essential, both for vehicles and pedestrians, to guide traffic or to identify hazards and ensure safety. A sign ordinance narrowly tailored to the challenges of protecting the safety of pedestrians, drivers, and passengers—such as warning signs marking hazards on private property, signs directing traffic, or street numbers associated with private houses—well might survive strict scrutiny. The signs at issue in this case, including political and ideological signs and signs for events, are far removed from those purposes. As discussed above, they are facially content based and are neither justified by traditional safety concerns nor narrowly tailored.

\* \* \*

2233\*2233 We reverse the judgment of the Court of Appeals and remand the case for proceedings consistent with this opinion.

*It is so ordered.*

Justice ALITO, with whom Justice KENNEDY and Justice SOTOMAYOR join, concurring.

I join the opinion of the Court but add a few words of further explanation.

As the Court holds, what we have termed "content-based" laws must satisfy strict scrutiny. Content-based laws merit this protection because they present, albeit sometimes in a subtler form, the same dangers as laws that regulate speech based on viewpoint. Limiting speech based on its "topic" or "subject" favors those who do not want to disturb the status quo. Such regulations may interfere with democratic self-government and the search for truth. See *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.,* 447 U.S. 530, 537, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980).

As the Court shows, the regulations at issue in this case are replete with content-based distinctions, and as a result they must satisfy strict scrutiny. This does not mean, however, that municipalities are powerless to enact and enforce reasonable sign regulations. I will not attempt to provide anything like a comprehensive list, but here are some rules that would not be content based:

Rules regulating the size of signs. These rules may distinguish among signs based on any content-neutral criteria, including any relevant criteria listed below.

Rules regulating the locations in which signs may be placed. These rules may distinguish between free-standing signs and those attached to buildings.

Rules distinguishing between lighted and unlighted signs.

Rules distinguishing between signs with fixed messages and electronic signs with messages that change.

Rules that distinguish between the placement of signs on private and public property.

Rules distinguishing between the placement of signs on commercial and residential property.

Rules distinguishing between on-premises and off-premises signs.

Rules restricting the total number of signs allowed per mile of roadway.

Rules imposing time restrictions on signs advertising a one-time event. Rules of this nature do not discriminate based on topic or subject and are akin to rules restricting the times within which oral speech or music is allowed.□

In addition to regulating signs put up by private actors, government entities may also erect their own signs consistent with the principles that allow governmental speech. See *Pleasant Grove City v. Summum,* 555 U.S. 460, 467-469, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009). They may put up all manner of signs to promote safety, as well as directional signs and signs pointing out historic sites and scenic spots.

Properly understood, today's decision will not prevent cities from regulating signs in a way that fully protects public 2234*2234 safety and serves legitimate esthetic objectives.

Justice BREYER, concurring in the judgment.

I join Justice KAGAN's separate opinion. Like Justice KAGAN I believe that categories alone cannot satisfactorily resolve the legal problem before us. The First Amendment requires greater judicial sensitivity both to the Amendment's expressive objectives and to the public's legitimate need for regulation than a simple recitation of categories, such as "content discrimination" and "strict scrutiny," would permit. In my view, the category "content discrimination" is better considered in many contexts, including here, as a rule of thumb, rather than as an automatic "strict scrutiny" trigger, leading to almost certain legal condemnation.

To use content discrimination to trigger strict scrutiny sometimes makes perfect sense. There are cases in which the Court has found content discrimination an unconstitutional method for suppressing a viewpoint. *E.g., Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 828-829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); see also *Boos v. Barry,* 485 U.S. 312, 318-319, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (plurality opinion) (applying strict scrutiny where the line between subject matter and viewpoint was not obvious). And there are cases where the Court has found content discrimination to reveal that rules governing a traditional public forum are, in fact, not a neutral way of fairly managing the forum in the interest of all speakers. *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) ("Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say"). In these types of cases, strict scrutiny is often appropriate, and content discrimination has thus served a useful purpose.

But content discrimination, while helping courts to identify unconstitutional suppression of expression, cannot and should not *always* trigger strict scrutiny. To say that it is not an automatic "strict scrutiny" trigger is not to argue against that concept's use. I readily concede, for example, that content discrimination, as a conceptual tool, can sometimes reveal weaknesses in the government's rationale for a rule that limits speech. If, for example, a city looks to litter prevention as the rationale for a prohibition against placing newsracks dispensing free advertisements on public property, why does it exempt other newsracks causing similar litter? Cf. *Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). I also concede that, whenever government disfavors one kind of speech, it places that speech at a disadvantage, potentially interfering with the free marketplace of ideas and with an individual's ability to express thoughts and ideas that can help that individual determine the kind of society in which he wishes to live, help shape that society, and help define his place within it.

Nonetheless, in these latter instances to use the presence of content discrimination automatically to trigger strict scrutiny and thereby call into play a strong presumption against constitutionality goes too far. That is because virtually all government activities involve speech, many of which involve the regulation of speech. Regulatory programs almost always require content discrimination. And to hold that such content discrimination triggers strict scrutiny is to write a recipe for judicial management of ordinary government regulatory activity.

Consider a few examples of speech regulated by government that inevitably involve 2235*2235 content discrimination, but where a strong presumption against

constitutionality has no place. Consider governmental regulation of securities, *e.g.,* 15 U.S.C. § 78*l* (requirements for content that must be included in a registration statement); of energy conservation labeling-practices, *e.g.,* 42 U.S.C. § 6294 (requirements for content that must be included on labels of certain consumer electronics); of prescription drugs, *e.g.,* 21 U.S.C. § 353(b)(4)(A) (requiring a prescription drug label to bear the symbol "Rx only"); of doctor-patient confidentiality, *e.g.,* 38 U.S.C. § 7332 (requiring confidentiality of certain medical records, but allowing a physician to disclose that the patient has HIV to the patient's spouse or sexual partner); of income tax statements, *e.g.,* 26 U.S.C. § 6039F (requiring taxpayers to furnish information about foreign gifts received if the aggregate amount exceeds $10,000); of commercial airplane briefings, *e.g.,* 14 CFR § 136.7 (2015) (requiring pilots to ensure that each passenger has been briefed on flight procedures, such as seatbelt fastening); of signs at petting zoos, *e.g.,* N.Y. Gen. Bus. Law Ann. § 399-ff(3) (West Cum. Supp. 2015) (requiring petting zoos to post a sign at every exit "`strongly recommend[ing] that persons wash their hands upon exiting the petting zoo area'"); and so on.

Nor can the majority avoid the application of strict scrutiny to all sorts of justifiable governmental regulations by relying on this Court's many subcategories and exceptions to the rule. The Court has said, for example, that we should apply less strict standards to "commercial speech." *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of N.Y.,* 447 U.S. 557, 562-563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). But I have some concern that many justifiable instances of "content-based" regulation are noncommercial. And, worse than that, the Court has applied the heightened "strict scrutiny" standard even in cases where the less stringent "commercial speech" standard was appropriate. See *Sorrell v. IMS Health Inc.,* 564 U.S. ___, ___, 131 S.Ct. 2653, 2664, 180 L.Ed.2d 544 (2011) (BREYER, J., dissenting). The Court has also said that "government speech" escapes First Amendment strictures. See *Rust v. Sullivan,* 500 U.S. 173, 193-194, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). But regulated speech is typically private speech, not government speech. Further, the Court has said that, "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists." *R.A.V. v. St. Paul,* 505 U.S. 377, 388, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). But this exception accounts for only a few of the instances in which content discrimination is readily justifiable.

I recognize that the Court could escape the problem by watering down the force of the presumption against constitutionality that "strict scrutiny" normally carries with it. But, in my view, doing so will weaken the First Amendment's protection in instances where "strict scrutiny" should apply in full force.

The better approach is to generally treat content discrimination as a strong reason weighing against the constitutionality of a rule where a traditional public forum, or where viewpoint discrimination, is threatened, but elsewhere treat it as a rule of thumb, finding it a helpful, but not determinative legal tool, in an appropriate case, to determine the strength of a justification. I would use content discrimination as a supplement to a more basic analysis, which, tracking most of our First Amendment cases, asks whether the regulation at issue works harm to First Amendment interests that is disproportionate in light of 2236*2236 the relevant regulatory objectives. Answering this question requires examining the seriousness of the harm to speech, the importance of the countervailing objectives, the extent to which

the law will achieve those objectives, and whether there are other, less restrictive ways of doing so. See, *e.g., United States v. Alvarez,* 567 U.S. ___, ___ _ ___, 132 S.Ct. 2537, 2551-2553, 183 L.Ed.2d 574 (2012) (BREYER, J., concurring in judgment); *Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377, 400-403, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (BREYER, J., concurring). Admittedly, this approach does not have the simplicity of a mechanical use of categories. But it does permit the government to regulate speech in numerous instances where the voters have authorized the government to regulate and where courts should hesitate to substitute judicial judgment for that of administrators.

Here, regulation of signage along the roadside, for purposes of safety and beautification is at issue. There is no traditional public forum nor do I find any general effort to censor a particular viewpoint. Consequently, the specific regulation at issue does not warrant "strict scrutiny." Nonetheless, for the reasons that Justice KAGAN sets forth, I believe that the Town of Gilbert's regulatory rules violate the First Amendment. I consequently concur in the Court's judgment only.

Justice KAGAN, with whom Justice GINSBURG and Justice BREYER join, concurring in the judgment.

Countless cities and towns across America have adopted ordinances regulating the posting of signs, while exempting certain categories of signs based on their subject matter. For example, some municipalities generally prohibit illuminated signs in residential neighborhoods, but lift that ban for signs that identify the address of a home or the name of its owner or occupant. See, *e.g.,* City of Truth or Consequences, N. M., Code of Ordinances, ch. 16, Art. XIII, §§11-13-2.3, 11-13-2.9(H)(4) (2014). In other municipalities, safety signs such as "Blind Pedestrian Crossing" and "Hidden Driveway" can be posted without a permit, even as other permanent signs require one. See, *e.g.,* Code of Athens-Clarke County, Ga., Pt. III, § 7-4-7(1) (1993). Elsewhere, historic site markers—for example, "George Washington Slept Here"—are also exempt from general regulations. See, *e.g.,* Dover, Del., Code of Ordinances, Pt. II, App. B, Art. 5, § 4.5(F) (2012). And similarly, the federal Highway Beautification Act limits signs along interstate highways unless, for instance, they direct travelers to "scenic and historical attractions" or advertise free coffee. See 23 U.S.C. §§ 131(b), (c)(1), (c)(5).

Given the Court's analysis, many sign ordinances of that kind are now in jeopardy. See *ante,* at 2231 (acknowledging that "entirely reasonable" sign laws "will sometimes be struck down" under its approach (internal quotation marks omitted)). Says the majority: When laws "single[] out specific subject matter," they are "facially content based"; and when they are facially content based, they are automatically subject to strict scrutiny. *Ante,* at 2230, 2232-2233. And although the majority holds out hope that some sign laws with subject-matter exemptions "might survive" that stringent review, *ante,* at 2232 - 2233, the likelihood is that most will be struck down. After all, it is the "rare case[]" in which a speech restriction withstands strict scrutiny." *Williams-Yulee v. Florida Bar,* 575 U.S. ___, ___, 135 S.Ct. 1656, 1666, ___ L.Ed.2d ___ (2015). To clear that high bar, the government must show that a content-based distinction "is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Arkansas Writers' Project, Inc.* 2237*2237 *v. Ragland,* 481 U.S. 221, 231, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987). So on the majority's view, courts would have to determine that a town has a compelling interest in informing

passersby where George Washington slept. And likewise, courts would have to find that a town has no other way to prevent hidden-driveway mishaps than by specially treating hidden-driveway signs. (Well-placed speed bumps? Lower speed limits? Or how about just a ban on hidden driveways?) The consequence—unless courts water down strict scrutiny to something unrecognizable—is that our communities will find themselves in an unenviable bind: They will have to either repeal the exemptions that allow for helpful signs on streets and sidewalks, or else lift their sign restrictions altogether and resign themselves to the resulting clutter.▯

Although the majority insists that applying strict scrutiny to all such ordinances is "essential" to protecting First Amendment freedoms, *ante,* at 2231, I find it challenging to understand why that is so. This Court's decisions articulate two important and related reasons for subjecting content-based speech regulations to the most exacting standard of review. The first is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *McCullen v. Coakley,* 573 U.S. ___, ___ _ ___, 134 S.Ct. 2518, 2529, 189 L.Ed.2d 502 (2014) (internal quotation marks omitted). The second is to ensure that the government has not regulated speech "based on hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. St. Paul,* 505 U.S. 377, 386, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). Yet the subject-matter exemptions included in many sign ordinances do not implicate those concerns. Allowing residents, say, to install a light bulb over "name and address" signs but no others does not distort the marketplace of ideas. Nor does that different treatment give rise to an inference of impermissible government motive.

We apply strict scrutiny to facially content-based regulations of speech, in keeping with the rationales just described, when there is any "realistic possibility that official suppression of ideas is afoot." *Davenport v. Washington Ed. Assn.,* 551 U.S. 177, 189, 127 S.Ct. 2372, 168 L.Ed.2d 71 (2007) (quoting *R.A.V.,* 505 U.S., at 390, 112 S.Ct. 2538). That is always the case when the regulation facially differentiates on the basis of viewpoint. See *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). It is also the case (except in non-public or limited public forums) when a law restricts "discussion of an entire topic" in public debate. *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n, of N. Y.,* 447 U.S. 530, 537, 539-540, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (invalidating a limitation on speech about nuclear power). We have stated that "[i]f the marketplace of ideas is to remain free and open, governments must not be allowed to choose `which issues are worth discussing or debating.'" *Id.,* at 537-538, 100 S.Ct. 2326 (quoting *Police Dept. of* 2238*2238 *Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)). And we have recognized that such subject-matter restrictions, even though viewpoint-neutral on their face, may "suggest[ ] an attempt to give one side of a debatable public question an advantage in expressing its views to the people." *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 785, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); accord, *ante,* at 2233 (ALITO, J., concurring) (limiting all speech on one topic "favors those who do not want to disturb the status quo"). Subject-matter regulation, in other words, may have the intent or effect of favoring some ideas over others. When that is realistically possible—when the restriction "raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace"—we insist that the law pass the most demanding constitutional test. *R.A.V.,* 505 U.S., at 387, 112 S.Ct. 2538 (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)).

But when that is not realistically possible, we may do well to relax our guard so that "entirely reasonable" laws imperiled by strict scrutiny can survive. *Ante,* at 2231. This point is by no means new. Our concern with content-based regulation arises from the fear that the government will skew the public's debate of ideas—so when "that risk is inconsequential, . . . strict scrutiny is unwarranted." *Davenport,* 551 U.S., at 188, 127 S.Ct. 2372; see *R.A.V.,* 505 U.S., at 388, 112 S.Ct. 2538 (approving certain content-based distinctions when there is "no significant danger of idea or viewpoint discrimination"). To do its intended work, of course, the category of content-based regulation triggering strict scrutiny must sweep more broadly than the actual harm; that category exists to create a buffer zone guaranteeing that the government cannot favor or disfavor certain viewpoints. But that buffer zone need not extend forever. We can administer our content-regulation doctrine with a dose of common sense, so as to leave standing laws that in no way implicate its intended function.

And indeed we have done just that: Our cases have been far less rigid than the majority admits in applying strict scrutiny to facially content-based laws—including in cases just like this one. See *Davenport,* 551 U.S., at 188, 127 S.Ct. 2372 (noting that "we have identified numerous situations in which [the] risk" attached to content-based laws is "attenuated"). In *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), the Court declined to apply strict scrutiny to a municipal ordinance that exempted address numbers and markers commemorating "historical, cultural, or artistic event[s]" from a generally applicable limit on sidewalk signs. *Id.,* at 792, n. 1, 104 S.Ct. 2118 (listing exemptions); see *id.,* at 804-810, 104 S.Ct. 2118 (upholding ordinance under intermediate scrutiny). After all, we explained, the law's enactment and enforcement revealed "not even a hint of bias or censorship." *Id.,* at 804, 104 S.Ct. 2118; see also *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (applying intermediate scrutiny to a zoning law that facially distinguished among movie theaters based on content because it was "designed to prevent crime, protect the city's retail trade, [and] maintain property values . . ., not to suppress the expression of unpopular views"). And another decision involving a similar law provides an alternative model. In *City of Ladue v. Gilleo,* 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), the Court assumed *arguendo* that a sign ordinance's exceptions for address 2239*2239 signs, safety signs, and for-sale signs in residential areas did not trigger strict scrutiny. See *id.,* at 46-47, and n. 6, 114 S.Ct. 2038 (listing exemptions); *id.,* at 53, 114 S.Ct. 2038 (noting this assumption). We did not need to, and so did not, decide the level-of-scrutiny question because the law's breadth made it unconstitutional under any standard.

The majority could easily have taken *Ladue*'s tack here. The Town of Gilbert's defense of its sign ordinance—most notably, the law's distinctions between directional signs and others—does not pass strict scrutiny, or intermediate scrutiny, or even the laugh test. See *ante,* at 2231 - 2232 (discussing those distinctions). The Town, for example, provides no reason at all for prohibiting more than four directional signs on a property while placing no limits on the number of other types of signs. See Gilbert, Ariz., Land Development Code, ch. I, §§ 4.402(J), (P)(2) (2014). Similarly, the Town offers no coherent justification for restricting the size of directional signs to 6 square feet while allowing other signs to reach 20 square feet. See §§ 4.402(J), (P)(1). The best the Town could come up with at oral argument was that directional signs "need to be smaller because they need to guide travelers along a route." Tr. of Oral Arg. 40. Why exactly a smaller sign better helps

travelers get to where they are going is left a mystery. The absence of any sensible basis for these and other distinctions dooms the Town's ordinance under even the intermediate scrutiny that the Court typically applies to "time, place, or manner" speech regulations. Accordingly, there is no need to decide in this case whether strict scrutiny applies to every sign ordinance in every town across this country containing a subject-matter exemption.

I suspect this Court and others will regret the majority's insistence today on answering that question in the affirmative. As the years go by, courts will discover that thousands of towns have such ordinances, many of them "entirely reasonable." *Ante,* at 2231. And as the challenges to them mount, courts will have to invalidate one after the other. (This Court may soon find itself a veritable Supreme Board of Sign Review.) And courts will strike down those democratically enacted local laws even though no one—certainly not the majority—has ever explained why the vindication of First Amendment values requires that result. Because I see no reason why such an easy case calls for us to cast a constitutional pall on reasonable regulations quite unlike the law before us, I concur only in the judgment.

[1] The Town's Sign Code is available online at http://www.gilbertaz.gov/departments/development-service/planning-development/land-development-code (as visited June 16, 2015, and available in Clerk of Court's case file).

[2] A "Temporary Sign" is a "sign not permanently attached to the ground, a wall or a building, and not designed or intended for permanent display." Glossary 25.

[3] The Code defines "Right-of-Way" as a "strip of publicly owned land occupied by or planned for a street, utilities, landscaping, sidewalks, trails, and similar facilities." *Id.,* at 18.

[4] The Sign Code has been amended twice during the pendency of this case. When litigation began in 2007, the Code defined the signs at issue as "Religious Assembly Temporary Direction Signs." App. 75. The Code entirely prohibited placement of those signs in the public right-of-way, and it forbade posting them in any location for more than two hours before the religious assembly or more than one hour afterward. *Id.,* at 75-76. In 2008, the Town redefined the category as "Temporary Directional Signs Related to a Qualifying Event," and it expanded the time limit to 12 hours before and 1 hour after the "qualifying event." *Ibid.* In 2011, the Town amended the Code to authorize placement of temporary directional signs in the public right-of-way. *Id.,* at 89.

[*] Of course, content-neutral restrictions on speech are not necessarily consistent with the First Amendment. Time, place, and manner restrictions "must be narrowly tailored to serve the government's legitimate, content-neutral interests." *Ward v. Rock Against Racism,* 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). But they need not meet the high standard imposed on viewpoint- and content-based restrictions.

[*] Even in trying (commendably) to limit today's decision, Justice ALITO's concurrence highlights its far-reaching effects. According to Justice ALITO, the majority does not subject to strict scrutiny regulations of "signs advertising a one-time event." *Ante,* at 2233 (ALITO, J., concurring). But of course it does. On the majority's view, a law with an exception for such signs "singles out specific subject matter for differential treatment" and "defin[es] regulated speech by particular subject matter." *Ante,* at 2227, 2230 (majority opinion). Indeed, the precise reason the majority applies strict scrutiny here is that "the Code singles out signs bearing a particular message: the time and location of a specific event." *Ante,* at 2231.

### 536 U.S. 150 (2002)

## WATCHTOWER BIBLE & TRACT SOCIETY OF NEW YORK, INC., et al.
### v.
## VILLAGE OF STRATTON et al.

No. 00-1737.

**United States Supreme Court.**

Argued February 26, 2002.
Decided June 17, 2002.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

152*152 152*152 Stevens, J., delivered the opinion of the Court, in which O'Connor, Kennedy, Souter, Ginsburg, and Breyer, JJ., joined. Breyer, J., filed a concurring opinion, in which Souter and Ginsburg, JJ., joined, *post,* p. 169. Scalia, J., filed an opinion concurring in the judgment, in which Thomas, J., joined, *post,* p. 171. Rehnquist, C. J., filed a dissenting opinion, *post,* p. 172.

*Paul D. Polidoro* argued the cause for petitioners. With him on the briefs were *Philip Brumley, Richard D. Moake,* and *Donald T. Ridley.*

*Abraham Cantor* argued the cause and filed a brief for respondents.

*David M. Gormley,* State Solicitor of Ohio, argued the cause for the State of Ohio et al. as *amici curiae* in support of respondents. With him on the brief were *Betty D. Montgomery,* Attorney General of Ohio, *Elise W. Porter* and *Kirk A. Lindsey,* Assistant Solicitors, and the Attorneys General for their respective States as follows: *Richard Blumenthal* of Connecticut, *Steve Carter* of Indiana, *Thomas J. Miller* of Iowa, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.,* of Maryland, *Thomas Reilly* of Massachusetts, *Frankie Sue Del Papa* of Nevada, *W. A. Drew Edmondson* of Oklahoma, and *Hoke MacMillan* of Wyoming.⸎

153*153 Justice Stevens, delivered the opinion of the Court.

Petitioners contend that a village ordinance making it a misdemeanor to engage in door-to-door advocacy without first registering with the mayor and receiving a permit violates the First Amendment. Through this facial challenge, we consider the door-to-door canvassing regulation not only as it applies to religious proselytizing, but also to anonymous political speech and the distribution of handbills.

# I

Petitioner Watchtower Bible and Tract Society of New York, Inc., coordinates the preaching activities of Jehovah's Witnesses throughout the United States and publishes Bibles and religious periodicals that are widely distributed. Petitioner Wellsville, Ohio, Congregation of Jehovah's Witnesses, Inc., supervises the activities of approximately 59 members in a part of Ohio that includes the Village of Stratton (Village). Petitioners offer religious literature without cost to anyone interested in reading it. They allege that they do not solicit contributions or orders for the sale of merchandise or services, but they do accept donations.

Petitioners brought this action against the Village and its mayor in the United States District Court for the Southern 154*154 District of Ohio, seeking an injunction against the enforcement of several sections of Ordinance No. 1998-5 regulating uninvited peddling and solicitation on private property in the Village. Petitioners' complaint alleged that the ordinance violated several constitutional rights, including the free exercise of religion, free speech, and the freedom of the press. App. 10a—44a. The District Court conducted a bench trial at which evidence of the administration of the ordinance and its effect on petitioners was introduced.

Section 116.01 prohibits "canvassers" and others from "going in and upon" private residential property for the purpose of promoting any "cause" without first having obtained a permit pursuant to § 116.03.[1] That section provides that any canvasser who intends to go on private property to promote a cause must obtain a "Solicitation Permit" from the office of the mayor; there is no charge for the permit, and apparently one is issued routinely after an applicant 155*155 fills out a fairly detailed "Solicitor's Registration Form."[2] The canvasser is then authorized to go upon premises that he listed on the registration form, but he must carry the permit upon his person and exhibit it whenever requested to do so by a police officer or by a resident.[3] The ordinance 156*156 sets forth grounds for the denial or revocation of a permit,[4] but the record before us does not show that any application has been denied or that any permit has been revoked. Petitioners did not apply for a permit.

A section of the ordinance that petitioners do not challenge establishes a procedure by which a resident may prohibit solicitation even by holders of permits. If the resident files a "No Solicitation Registration Form" with the mayor, and also posts a "No Solicitation" sign on his property, no uninvited canvassers may enter his property, unless they are specifically authorized to do so in the "No Solicitation Registration Form" itself.[5] Only 32 of the Village's 278 residents 157*157 filed such forms. Each of the forms in the record contains a list of 19 suggested exceptions;[6] on one form, a resident checked 17 exceptions, thereby excluding only "Jehovah's Witnesses" and "Political Candidates" from the list of invited canvassers. Although Jehovah's Witnesses do not consider themselves to be "solicitors" because they make no charge for their literature or their teaching, leaders of the church testified at trial that they would honor "no solicitation" signs in the Village. They also explained at trial that they did not apply for a permit because they derive their authority to 158*158 preach from Scripture.[7] "For us to seek a permit from a municipality to preach we feel would almost be an insult to God." App. 321a.

Petitioners introduced some evidence that the ordinance was the product of the mayor's hostility to their ministry, but the District Court credited the mayor's testimony that it had been designed to protect the privacy rights of the Village residents, specifically to protect them "from `flim flam' con artists who prey on small town populations." 61 F. Supp. 2d 734, 736 (SD Ohio 1999). Nevertheless, the court concluded that the terms of the ordinance applied to the activities of petitioners as well as to "business or political canvassers," *id.,* at 737, 738.

The District Court upheld most provisions of the ordinance as valid, content-neutral regulations that did not infringe on petitioners' First Amendment rights. The court did, however, require the Village to accept narrowing constructions of three provisions. First, the court viewed the requirement in § 116.03(b)(5) that the applicant must list the specific

address of each residence to be visited as potentially invalid, but cured by the Village's agreement to attach to the form a list of willing residents. *Id.,* at 737. Second, it held that petitioners could comply with § 116.03(b)(6) by merely stating their purpose as "the Jehovah's Witness ministry." *Id.,* at 738. And third, it held that § 116.05, which limited canvassing to the hours before 5 p.m., was invalid on its face and should be replaced with a provision referring to "reasonable hours of the day." *Id.,* at 739. As so modified, the court held the ordinance constitutionally valid as applied to petitioners and dismissed the case.

159*159 The Court of Appeals for the Sixth Circuit affirmed. 240 F. 3d 553 (2001). It held that the ordinance was "content neutral and of general applicability and therefore subject to intermediate scrutiny." *Id.,* at 560. It rejected petitioners' reliance on the discussion of laws affecting both the free exercise of religion and free speech in *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872 (1990),[8] because that "language was dicta and therefore not binding." 240 F. 3d, at 561. It also rejected petitioners' argument that the ordinance is overbroad because it impairs the right to distribute pamphlets anonymously that we recognized in *McIntyre* v. *Ohio Elections Comm'n,* 514 U. S. 334 (1995), reasoning that "the very act of going door-to-door requires the canvassers to reveal a portion of their identities." 240 F. 3d, at 563. The Court of Appeals concluded that the interests promoted by the Village—"protecting its residents from fraud and undue annoyance"—as well as the harm that it seeks to prevent—"criminals posing as canvassers in order to defraud its residents"—though "by no means overwhelming," were sufficient to justify the regulation. *Id.,* at 565— 566. The court distinguished earlier cases protecting the Jehovah's Witnesses ministry because those cases either involved 160*160 a flat prohibition on the dissemination of ideas, *e. g., Martin* v. *City of Struthers,* 319 U. S. 141 (1943), or an ordinance that left the issuance of a permit to the discretion of a municipal officer, see, *e. g., Cantwell* v. *Connecticut,* 310 U. S. 296, 302 (1940).

In dissent, Judge Gilman expressed the opinion that by subjecting noncommercial solicitation to the permit requirements, the ordinance significantly restricted a substantial quantity of speech unrelated to the Village's interest in eliminating fraud and unwanted annoyance. In his view, the Village "failed to demonstrate either the reality of the harm or the efficacy of the restriction." 240 F. 3d, at 572.

We granted certiorari to decide the following question: "Does a municipal ordinance that requires one to obtain a permit prior to engaging in the door-to-door advocacy of a political cause and to display upon demand the permit, which contains one's name, violate the First Amendment protection accorded to anonymous pamphleteering or discourse?" 534 U. S. 971 (2001); Pet. for Cert. i.[9]

## II

For over 50 years, the Court has invalidated restrictions on door-to-door canvassing and pamphleteering.[10] It is more than historical accident that most of these cases involved First Amendment challenges brought by Jehovah's Witnesses, because door-to-door canvassing is mandated by their religion. As we noted in *Murdock* v. *Pennsylvania,* 161*161 319 U. S. 105, 108 (1943), the Jehovah's Witnesses "claim to follow the example of Paul, teaching `publickly, and from house to house.' Acts 20:20. They take literally the mandate of the Scriptures, `Go ye into all the world, and preach the gospel to every creature.' Mark 16:15.

In doing so they believe that they are obeying a commandment of God." Moreover, because they lack significant financial resources, the ability of the Witnesses to proselytize is seriously diminished by regulations that burden their efforts to canvass door-to-door.

Although our past cases involving Jehovah's Witnesses, most of which were decided shortly before and during World War II, do not directly control the question we confront today, they provide both a historical and analytical backdrop for consideration of petitioners' First Amendment claim that the breadth of the Village's ordinance offends the First Amendment.[11] Those cases involved petty offenses that raised constitutional questions of the most serious magnitude—questions that implicated the free exercise of religion, the freedom of speech, and the freedom of the press. From these decisions, several themes emerge that guide our consideration of the ordinance at issue here.

First, the cases emphasize the value of the speech involved. For example, in _Murdock_ v. _Pennsylvania,_ the Court noted that "hand distribution of religious tracts is an age-old form of missionary evangelism—as old as the history of printing presses. It has been a potent force in various religious movements down through the years. . . . This form of religious activity occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits. It has the same claim to protection as the more orthodox and conventional exercises of religion. 162*162 It also has the same claim as the others to the guarantees of freedom of speech and freedom of the press." _Id.,_ at 108-109.

In addition, the cases discuss extensively the historical importance of door-to-door canvassing and pamphleteering as vehicles for the dissemination of ideas. In _Schneider_ v. _State (Town of Irvington),_ 308 U. S. 147 (1939), the petitioner was a Jehovah's Witness who had been convicted of canvassing without a permit based on evidence that she had gone from house to house offering to leave books or booklets. Writing for the Court, Justice Roberts stated that "pamphlets have proved most effective instruments in the dissemination of opinion. And perhaps the most effective way of bringing them to the notice of individuals is their distribution at the homes of the people. On this method of communication the ordinance imposes censorship, abuse of which engendered the struggle in England which eventuated in the establishment of the doctrine of the freedom of the press embodied in our Constitution. To require a censorship through license which makes impossible the _free and unhampered_ distribution of pamphlets strikes at the very heart of the constitutional guarantees." _Id.,_ at 164 (emphasis added).

Despite the emphasis on the important role that door-todoor canvassing and pamphleteering has played in our constitutional tradition of free and open discussion, these early cases also recognized the interests a town may have in some form of regulation, particularly when the solicitation of money is involved. In _Cantwell_ v. _Connecticut,_ 310 U. S. 296 (1940), the Court held that an ordinance requiring Jehovah's Witnesses to obtain a license before soliciting door to door was invalid because the issuance of the license depended on the exercise of discretion by a city official. Our opinion recognized that "a State may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds 163*163 for any purpose, to establish his identity and his authority to act for the cause which he purports to represent." _Id.,_ at 306. Similarly, in _Martin_ v. _City of Struthers,_ the Court recognized crime

prevention as a legitimate interest served by these ordinances and noted that "burglars frequently pose as canvassers, either in order that they may have a pretense to discover whether a house is empty and hence ripe for burglary, or for the purpose of spying out the premises in order that they may return later." 319 U. S., at 144. Despite recognition of these interests as legitimate, our precedent is clear that there must be a balance between these interests and the effect of the regulations on First Amendment rights. We "must `be astute to examine the effect of the challenged legislation' and must `weigh the circumstances and . . . appraise the substantiality of the reasons advanced in support of the regulation.' " *Ibid.* (quoting *Schneider,* 308 U. S., at 161).

Finally, the cases demonstrate that efforts of the Jehovah's Witnesses to resist speech regulation have not been a struggle for their rights alone. In *Martin,* after cataloging the many groups that rely extensively upon this method of communication, the Court summarized that "[d]oor to door distribution of circulars is essential to the poorly financed causes of little people." 319 U. S., at 144-146.

That the Jehovah's Witnesses are not the only "little people" who face the risk of silencing by regulations like the Village's is exemplified by our cases involving nonreligious speech. See, *e. g., Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620 (1980); *Hynes* v. *Mayor and Council of Oradell,* 425 U. S. 610 (1976); *Thomas* v. *Collins,* 323 U. S. 516 (1945). In *Thomas,* the issue was whether a labor leader could be required to obtain a permit before delivering a speech to prospective union members. After reviewing the Jehovah's Witnesses cases discussed above, the Court observed:

164*164 "As a matter of principle a requirement of registration in order to make a public speech would seem generally incompatible with an exercise of the rights of free speech and free assembly. . . .

. . . . .

"If the exercise of the rights of free speech and free assembly cannot be made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them and making such a condition the foundation for restraining in advance their exercise and for imposing a penalty for violating such a restraining order. So long as no more is involved than exercise of the rights of free speech and free assembly, it is immune to such a restriction. If one who solicits support for the cause of labor may be required to register as a condition to the exercise of his right to make a public speech, so may he who seeks to rally support for any social, business, religious or political cause. We think a requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment." *Id.,* at 539-540.

Although these World War II-era cases provide guidance for our consideration of the question presented, they do not answer one preliminary issue that the parties adamantly dispute. That is, what standard of review ought we use in assessing the constitutionality of this ordinance. We find it unnecessary, however, to resolve that dispute because the

breadth of speech affected by the ordinance and the nature of the regulation make it clear that the Court of Appeals erred in upholding it.

# III

The Village argues that three interests are served by its ordinance: the prevention of fraud, the prevention of crime, 165*165 and the protection of residents' privacy. We have no difficulty concluding, in light of our precedent, that these are important interests that the Village may seek to safeguard through some form of regulation of solicitation activity. We must also look, however, to the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve.

The text of the Village's ordinance prohibits "canvassers" from going on private property for the purpose of explaining or promoting any "cause," unless they receive a permit and the residents visited have not opted for a "no solicitation" sign. Had this provision been construed to apply only to commercial activities and the solicitation of funds, arguably the ordinance would have been tailored to the Village's interest in protecting the privacy of its residents and preventing fraud. Yet, even though the Village has explained that the ordinance was adopted to serve those interests, it has never contended that it should be so narrowly interpreted. To the contrary, the Village's administration of its ordinance unquestionably demonstrates that the provisions apply to a significant number of noncommercial "canvassers" promoting a wide variety of "causes." Indeed, on the "No Solicitation Forms" provided to the residents, the canvassers include "Camp Fire Girls," "Jehovah's Witnesses," "Political Candidates," "Trick or Treaters during Halloween Season," and "Persons Affiliated with Stratton Church." The ordinance unquestionably applies, not only to religious causes, but to political activity as well. It would seem to extend to "residents casually soliciting the votes of neighbors,"[12] or ringing doorbells to enlist support for employing a more efficient garbage collector.

The mere fact that the ordinance covers so much speech raises constitutional concerns. It is offensive—not only to 166*166 the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so. Even if the issuance of permits by the mayor's office is a ministerial task that is performed promptly and at no cost to the applicant, a law requiring a permit to engage in such speech constitutes a dramatic departure from our national heritage and constitutional tradition. Three obvious examples illustrate the pernicious effect of such a permit requirement.

First, as our cases involving distribution of unsigned handbills demonstrate,[13] there are a significant number of persons who support causes anonymously.[14] "The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *McIntyre* v. *Ohio Elections Comm'n,* 514 U. S., at 341-342. The requirement that a canvasser must be identified in a permit application filed in the mayor's office and available for public inspection necessarily results in a surrender of that anonymity. Although it is true, as the Court of Appeals suggested, see 240 F. 3d, at 563, that persons who are

known to the resident reveal their allegiance to a group or cause when they present themselves at the front door to advocate an issue or to deliver a handbill, the Court of Appeals erred in concluding that the ordinance does not implicate anonymity interests. The Sixth Circuit's reasoning is undermined by 167*167 our decision in *Buckley* v. *American Constitutional Law Foundation, Inc.,* 525 U. S. 182 (1999). The badge requirement that we invalidated in *Buckley* applied to petition circulators seeking signatures in face-to-face interactions. The fact that circulators revealed their physical identities did not foreclose our consideration of the circulators' interest in maintaining their anonymity. In the Village, strangers to the resident certainly maintain their anonymity, and the ordinance may preclude such persons from canvassing for unpopular causes. Such preclusion may well be justified in some situations—for example, by the special state interest in protecting the integrity of a ballot-initiative process, see *ibid.,* or by the interest in preventing fraudulent commercial transactions. The Village ordinance, however, sweeps more broadly, covering unpopular causes unrelated to commercial transactions or to any special interest in protecting the electoral process.

Second, requiring a permit as a prior condition on the exercise of the right to speak imposes an objective burden on some speech of citizens holding religious or patriotic views. As our World War II-era cases dramatically demonstrate, there are a significant number of persons whose religious scruples will prevent them from applying for such a license. There are no doubt other patriotic citizens, who have such firm convictions about their constitutional right to engage in uninhibited debate in the context of door-to-door advocacy, that they would prefer silence to speech licensed by a petty official.

Third, there is a significant amount of spontaneous speech that is effectively banned by the ordinance. A person who made a decision on a holiday or a weekend to take an active part in a political campaign could not begin to pass out handbills until after he or she obtained the required permit. Even a spontaneous decision to go across the street and urge a neighbor to vote against the mayor could not lawfully be implemented without first obtaining the mayor's permission. 168*168 In this respect, the regulation is analogous to the circulation licensing tax the Court invalidated in *Grosjean* v. *American Press Co.,* 297 U. S. 233 (1936). In *Grosjean,* while discussing the history of the Free Press Clause of the First Amendment, the Court stated that "'[t]he evils to be prevented were not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens.' " *Id.,* at 249-250 (quoting 2 T. Cooley, Constitutional Limitations 886 (8th ed. 1927)); see also *Lovell* v. *City of Griffin,* 303 U. S. 444 (1938).

The breadth and unprecedented nature of this regulation does not alone render the ordinance invalid. Also central to our conclusion that the ordinance does not pass First Amendment scrutiny is that it is not tailored to the Village's stated interests. Even if the interest in preventing fraud could adequately support the ordinance insofar as it applies to commercial transactions and the solicitation of funds, that interest provides no support for its application to petitioners, to political campaigns, or to enlisting support for unpopular causes. The Village, however, argues that the ordinance is nonetheless valid because it serves the two additional interests of protecting the privacy of the resident and the prevention of crime.

With respect to the former, it seems clear that § 107 of the ordinance, which provides for the posting of "No Solicitation" signs and which is not challenged in this case, coupled with the resident's unquestioned right to refuse to engage in conversation with unwelcome visitors, provides ample protection for the unwilling listener. _Schaumburg,_ 444 U. S., at 639 ("[T]he provision permitting homeowners to bar solicitors from their property by posting [no solicitation] signs . . . suggest[s] the availability of less intrusive and more effective measures to protect privacy"). The annoyance caused by an 169*169 uninvited knock on the front door is the same whether or not the visitor is armed with a permit.

With respect to the latter, it seems unlikely that the absence of a permit would preclude criminals from knocking on doors and engaging in conversations not covered by the ordinance. They might, for example, ask for directions or permission to use the telephone, or pose as surveyers or census takers. See n. 1, _supra._ Or they might register under a false name with impunity because the ordinance contains no provision for verifying an applicant's identity or organizational credentials. Moreover, the Village did not assert an interest in crime prevention below, and there is an absence of any evidence of a special crime problem related to doorto-door solicitation in the record before us.

The rhetoric used in the World War II-era opinions that repeatedly saved petitioners' coreligionists from petty prosecutions reflected the Court's evaluation of the First Amendment freedoms that are implicated in this case. The value judgment that then motivated a united democratic people fighting to defend those very freedoms from totalitarian attack is unchanged. It motivates our decision today.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

_It is so ordered._

Justice Breyer, with whom Justice Souter and Justice Ginsburg join, concurring.

While joining the Court's opinion, I write separately to note that the dissent's "crime prevention" justification for this ordinance is not a strong one. Cf. _post,_ at 176-180 (opinion of Rehnquist, C. J.). For one thing, there is no indication that the legislative body that passed the ordinance considered this justification. Stratton did not rely on the rationale in the courts below, see 61 F. Supp. 2d 734, 736 (SD Ohio 1999) (opinion of the District Court describing the 170*170 ordinance as "constructed to protect the Village residents from `flim flam' con artists"); 240 F. 3d 553, 565 (CA6 2001) (opinion of the Court of Appeals describing interests as "protecting [the Village's] residents from fraud and undue annoyance"), and its general references to "deter[ing] crime" in its brief to this Court cannot fairly be construed to include anything other than the fraud it discusses specifically. Brief for Respondents 14-18.

In the intermediate scrutiny context, the Court ordinarily does not supply reasons the legislative body has not given. Cf. _United States_ v. _Playboy Entertainment Group, Inc.,_ 529 U. S. 803, 816 (2000) ("When the Government restricts speech, _the Government bears the burden_ of proving the constitutionality of its actions" (emphasis added)). That does not mean, as The Chief Justice suggests, that only a government with a "battery of

constitutional lawyers," *post,* at 172, could satisfy this burden. It does mean that we expect a government to give its real reasons for passing an ordinance. Legislators, in even the smallest town, are perfectly able to do so—sometimes better on their own than with too many lawyers, *e. g.,* a "battery," trying to offer their advice. I can only conclude that if the village of Stratton thought preventing burglaries and violent crimes was an important justification for this ordinance, it would have said so.

But it is not just that. It is also intuitively implausible to think that Stratton's ordinance serves any governmental interest in preventing such crimes. As the Court notes, several categories of potential criminals will remain entirely untouched by the ordinance. *Ante,* at 168-169, 154, n. 1. And as to those who might be affected by it, "[w]e have never accepted mere conjecture as adequate to carry a First Amendment burden," *Nixon* v. *Shrink Missouri Government PAC,* 528 U. S. 377, 392 (2000). Even less readily should we accept such implausible conjecture offered not by the party itself but only by an *amicus,* see Brief for Ohio et al. as *Amici Curiae* 5-6.

171*171 Because Stratton did not rely on the crime prevention justification, because Stratton has not now "present[ed] more than anecdote and supposition," *Playboy Entertainment Group, supra,* at 822, and because the relationship between the interest and the ordinance is doubtful, I am unwilling to assume that these conjectured benefits outweigh the cost of abridging the speech covered by the ordinance.

Justice Scalia, with whom Justice Thomas joins, concurring in the judgment.

I concur in the judgment, for many but not all of the reasons set forth in the opinion for the Court. I do not agree, for example, that one of the causes of the invalidity of Stratton's ordinance is that some people have a religious objection to applying for a permit, and others (posited by the Court) "have such firm convictions about their constitutional right to engage in uninhibited debate in the context of doorto-door advocacy, that they would prefer silence to speech licensed by a petty official." *Ante,* at 167.

If a licensing requirement is otherwise lawful, it is in my view not invalidated by the fact that some people will choose, for religious reasons, to forgo speech rather than observe it. That would convert an invalid free-exercise claim, see *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872 (1990), into a valid free-speech claim—and a more destructive one at that. Whereas the free-exercise claim, if acknowledged, would merely exempt Jehovah's Witnesses from the licensing requirement, the free-speech claim exempts *everybody,* thanks to Jehovah's Witnesses.

As for the Court's fairytale category of "patriotic citizens," *ante,* at 167, who would rather be silenced than licensed in a manner that the Constitution (but for their "patriotic" objection) would permit: If our free-speech jurisprudence is to be determined by the predicted behavior of such crackpots, we are in a sorry state indeed.

172*172 Chief Justice Rehnquist, dissenting.

Stratton is a village of 278 people located along the Ohio River where the borders of Ohio, West Virginia, and Pennsylvania converge. It is strung out along a multilane highway

connecting it with the cities of East Liverpool to the north and Steubenville and Weirton, West Virginia, to the south. One may doubt how much legal help a village of this size has available in drafting an ordinance such as the present one, but even if it had availed itself of a battery of constitutional lawyers, they would have been of little use in the town's effort. For the Court today ignores the cases on which those lawyers would have relied, and comes up with newly fashioned doctrine. This doctrine contravenes wellestablished precedent, renders local governments largely impotent to address the very real safety threat that canvassers pose, and may actually result in less of the door-to-door communication that it seeks to protect.

More than half a century ago we recognized that canvassers, "whether selling pots or distributing leaflets, may lessen the peaceful enjoyment of a home," and that "burglars frequently pose as canvassers, either in order that they may have a pretense to discover whether a house is empty and hence ripe for burglary, or for the purpose of spying out the premises in order that they may return later." *Martin* v. *City of Struthers,* 319 U. S. 141, 144 (1943). These problems continue to be associated with door-to-door canvassing, as are even graver ones.

A recent double murder in Hanover, New Hampshire, a town of approximately 7,500 that would appear tranquil to most Americans but would probably seem like a bustling town of Dartmouth College students to Stratton residents, illustrates these dangers. Two teenagers murdered a married couple of Dartmouth College professors, Half and Susanne Zantop, in the Zantops' home. Investigators have concluded, based on the confession of one of the teenagers, that the teenagers went door-to-door intent on stealing 173*173 access numbers to bank debit cards and then killing their owners. See Dartmouth Professors Called Random Targets, Washington Post, Feb. 20, 2002, p. A2. Their *modus operandi* was to tell residents that they were conducting an environmental survey for school. They canvassed a few homes where no one answered. At another, the resident did not allow them in to conduct the "survey." They were allowed into the Zantop home. After conducting the phony environmental survey, they stabbed the Zantops to death. See *ibid.*

In order to reduce these very grave risks associated with canvassing, the 278 "`little people,'" *ante,* at 163, of Stratton, who, unlike petitioners, do not have a team of attorneys at their ready disposal, see Jehovah's Witnesses May Make High Court History Again, Legal Times, Feb. 25, 2002, p. 1 (noting that petitioners have a team of 12 lawyers in their New York headquarters), enacted the ordinance at issue here. The residents did not prohibit door-to-door communication; they simply required that canvassers obtain a permit before going door-to-door. And the village does not have the discretion to reject an applicant who completes the application.

The town had little reason to suspect that the negligible burden of having to obtain a permit runs afoul of the First Amendment. For over 60 years, we have categorically stated that a permit requirement for door-to-door canvassers, which gives no discretion to the issuing authority, is constitutional. The District Court and Court of Appeals, relying on our cases, upheld the ordinance. The Court today, however, abruptly changes course and invalidates the ordinance.

The Court speaks of the "historical and analytical backdrop for consideration of petitioners' First Amendment claim," *ante,* at 161. But this "backdrop" is one of longstanding and unwavering approval of a permit requirement like Stratton's. Our early decisions in this area expressly 174*174 sanction a law that merely requires a canvasser to register. In *Cantwell* v. *Connecticut,* 310 U. S. 296, 306 (1940), we stated that "[w]ithout doubt a State may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent." In *Murdock* v. *Pennsylvania,* 319 U. S. 105, 116 (1943), we contrasted the license tax struck down in that case with "merely a registration ordinance calling for an identification of the solicitors so as to give the authorities some basis for investigating strangers coming into the community." And *Martin, supra,* at 148, states that a "city can punish those who call at a home in defiance of the previously expressed will of the occupant and, in addition, can by identification devices control the abuse of the privilege by criminals posing as canvassers."

It is telling that Justices Douglas and Black, perhaps the two Justices in this Court's history most identified with an expansive view of the First Amendment, authored, respectively, *Murdock* and *Martin.* Their belief in the constitutionality of the permit requirement that the Court strikes down today demonstrates just how far the Court's present jurisprudence has strayed from the core concerns of the First Amendment.

We reaffirmed our view that a discretionless permit requirement is constitutional in *Hynes* v. *Mayor and Council of Oradell,* 425 U. S. 610 (1976). *Hynes,* though striking down a registration ordinance on vagueness grounds, noted that "the Court has consistently recognized a municipality's power to protect its citizens from crime and undue annoyance by regulating soliciting and canvassing. A narrowly drawn ordinance, that does not vest in municipal officials the undefined power to determine what messages residents will hear, may serve these important interests without running afoul of the First Amendment." *Id.,* at 616-617.

175*175 The Stratton ordinance suffers from none of the defects deemed fatal in these earlier decisions. The ordinance does not prohibit door-to-door canvassing; it merely requires that canvassers fill out a form and receive a permit. Cf. *Martin, supra.* The mayor does not exercise any discretion in deciding who receives a permit; approval of the permit is automatic upon proper completion of the form. Cf. *Cantwell, supra.* And petitioners do not contend in this Court that the ordinance is vague. Cf. *Hynes, supra.*

Just as troubling as the Court's ignoring over 60 years of precedent is the difficulty of discerning from the Court's opinion what exactly it is about the Stratton ordinance that renders it unconstitutional. It is not clear what test the Court is applying, or under which part of that indeterminate test the ordinance fails. See *ante,* at 164 (finding it "unnecessary . . . to resolve" what standard of review applies to the ordinance). We are instead told that the "breadth of speech affected" and "the nature of the regulation" render the permit requirement unconstitutional. *Ibid.* Under a straightforward application of the applicable First Amendment framework, however, the ordinance easily passes muster.

There is no support in our case law for applying anything more stringent than intermediate scrutiny to the ordinance. The ordinance is content neutral and does not bar anyone from

going door-to-door in Stratton. It merely regulates the manner in which one must canvass: A canvasser must first obtain a permit. It is, or perhaps I should say was, settled that the "government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions `are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' " _Ward_ v. _Rock Against Racism,_ 491 U. S. 781, 791 (1989) (quoting _Clark_ v. _Community for Creative Non-Violence,_ 468 U. S. 288, 293 (1984)). Earlier 176*176 this Term, the Court reaffirmed that this test applies to content-neutral time, place, or manner restrictions on speech in public forums. See _Thomas_ v. _Chicago Park Dist.,_ 534 U. S. 316 (2002).

The Court suggests that Stratton's regulation of speech warrants greater scrutiny. _Ante,_ at 164. But it would be puzzling if regulations of speech taking place on _another citizen's_ private property warranted greater scrutiny than regulations of speech taking place in public forums. Common sense and our precedent say just the opposite. In _Hynes,_ the Court explained: "`Of all the methods of spreading unpopular ideas, [house-to-house canvassing] seems the least entitled to extensive protection. The possibilities of persuasion are slight compared with the certainties of annoyance. Great as is the value of exposing citizens to novel views, home is one place where a man ought to be able to shut himself up in his own ideas if he desires.' " 425 U. S., at 619 (quoting Z. Chafee, Free Speech in the United States 406 (1954)). In _Ward,_ the Court held that intermediate scrutiny was appropriate "_even_ in a public forum," 491 U. S., at 791 (emphasis added), appropriately recognizing that speech enjoys greater protection in a public forum that has been opened to all citizens, see _ibid._ Indeed, we have held that the mere proximity of private residential property to a public forum permits more extensive regulation of speech taking place at the public forum than would otherwise be allowed. See _Frisby_ v. _Schultz,_ 487 U. S. 474, 483-484 (1988). Surely then, intermediate scrutiny applies to a content-neutral regulation of speech that occurs not just near, but at, another citizen's private residence.

The Stratton regulation is aimed at three significant governmental interests: the prevention of fraud, the prevention of crime, and the protection of privacy.[1] The Court concedes 177*177 that "in light of our precedent, . . . these are important interests that [Stratton] may seek to safeguard through some form of regulation of solicitation activity." _Ante,_ at 165. Although initially recognizing the important interest in preventing crime, the Court later indicates that the "absence of any evidence of a special crime problem related to door-todoor solicitation in the record before us" lessens this interest. _Ante,_ at 169. But the village is entitled to rely on our assertion in _Martin_ that door-to-door canvassing poses a risk of crime, see _Erie_ v. _Pap's A. M.,_ 529 U. S. 277, 297 (2000) (citing _Renton_ v. _Playtime Theatres, Inc.,_ 475 U. S. 41 (1986)), and the experience of other jurisdictions with crime stemming from door-to-door canvassing, see 529 U. S., at 297; _Nixon_ v. _Shrink Missouri Government PAC,_ 528 U. S. 377, 393, n. 6 (2000).

The double murder in Hanover described above is but one tragic example of the crime threat posed by door-to-door canvassing. Other recent examples include a man soliciting gardening jobs door-to-door who tied up and robbed elderly residents, see Van Derbken, 98-Year-Old Latest Victim in Series of Home Invasions, San Francisco Chronicle, Sept. 13, 2000, p. A18, a door-to-door vacuum cleaner salesman who raped a woman, see

Employers Liable for Rape by Salesman, Texas Lawyer, Jan. 11, 1999, p. 2, and a man going door-todoor purportedly on behalf of a church group who committed multiple sexual assaults, see Ingersoll, Sex Crime Suspect Traveled with Church Group, Wis. State Journal, Feb. 19, 2000, p. 1B. The Constitution does not require that Stratton first endure its own crime wave before it takes measures to prevent crime.

What is more, the Court soon forgets both the privacy and crime interests. It finds the ordinance too broad because it applies to a "significant number of noncommercial `canvassers.' " *Ante,* at 165. But noncommercial canvassers, for example, those purporting to conduct environmental surveys for school, see *supra,* at 172-173, can violate no trespassing 178*178 signs and engage in burglaries and violent crimes just as easily as commercial canvassers can. See *Martin,* 319 U. S., at 144 (canvassers, "whether selling pots *or distributing leaflets,* may lessen the peaceful enjoyment of a home" and "sp[y] out" homes for burglaries (emphasis added)). Stratton's ordinance is thus narrowly tailored. It applies to everyone who poses the risks associated with door-to-door canvassing, *i. e.,* it applies to everyone who canvasses doorto-door. The Court takes what should be a virtue of the ordinance—that it is content neutral, cf. *44 Liquormart, Inc.* v. *Rhode Island,* 517 U. S. 484, 501 (1996) ("[O]ur commercial speech cases have recognized the dangers that attend governmental attempts to single out certain messages for suppression")—and turns it into a vice.

The next question is whether the ordinance serves the important interests of protecting privacy and preventing fraud and crime. With respect to the interest in protecting privacy, the Court concludes that "[t]he annoyance caused by an uninvited knock on the front door is the same whether or not the visitor is armed with a permit." *Ante,* at 168-169. True, but that misses the key point: The permit requirement results in fewer uninvited knocks. Those who have complied with the permit requirement are less likely to visit residences with no trespassing signs, as it is much easier for the authorities to track them down.

The Court also fails to grasp how the permit requirement serves Stratton's interest in preventing crime.[2] We have approved of permit requirements for those engaging in protected First Amendment activity because of a commonsense recognition that their existence both deters and helps detect wrongdoing. See, *e. g., Thomas* v. *Chicago Park Dist.,* 534 179*179 U. S. 316 (2002) (upholding a permit requirement aimed, in part, at preventing unlawful uses of a park and assuring financial accountability for damage caused by the event). And while some people, intent on committing burglaries or violent crimes, are not likely to be deterred by the prospect of a misdemeanor for violating the permit ordinance, the ordinance's effectiveness does not depend on criminals registering.

The ordinance prevents and detects serious crime by making it a crime not to register. Take the Hanover double murder discussed earlier. The murderers did not achieve their objective until they visited their fifth home over a period of seven months. If Hanover had a permit requirement, the teens may have been stopped before they achieved their objective. One of the residents they visited may have informed the police that there were two canvassers who lacked a permit. Such neighborly vigilance, though perhaps foreign to those residing in modern day cities, is not uncommon in small towns. Or the police on their own may have discovered that two canvassers were violating the ordinance. Apprehension for violating the

permit requirement may well have frustrated the teenagers' objectives; it certainly would have assisted in solving the murders had the teenagers gone ahead with their plan.[3]

Of course, the Stratton ordinance does not guarantee that no canvasser will ever commit a burglary or violent crime. The Court seems to think this dooms the ordinance, erecting an insurmountable hurdle that a law must provide a foolproof method of preventing crime. In order to survive intermediate scrutiny, however, a law need not solve the crime 180*180 problem, it need only further the interest in preventing crime. Some deterrence of serious criminal activity is more than enough to survive intermediate scrutiny.

The final requirement of intermediate scrutiny is that a regulation leave open ample alternatives for expression. Undoubtedly, ample alternatives exist here. Most obviously, canvassers are free to go door-to-door after filling out the permit application. And those without permits may communicate on public sidewalks, on street corners, through the mail, or through the telephone.

Intermediate scrutiny analysis thus confirms what our cases have long said: A discretionless permit requirement for canvassers does not violate the First Amendment. Today, the Court elevates its concern with what is, at most, a negligible burden on door-to-door communication above this established proposition. Ironically, however, today's decision may result in less of the door-to-door communication that the Court extols. As the Court recognizes, any homeowner may place a "No Solicitation" sign on his or her property, and it is a crime to violate that sign. *Ante,* at 168. In light of today's decision depriving Stratton residents of the degree of accountability and safety that the permit requirement provides, more and more residents may decide to place these signs in their yards and cut off door-to-door communication altogether.

[*] Briefs of *amici curiae* urging reversal were filed for Commonwealth of the Northern Mariana Islands by *Herbert D. Soll,* Attorney General, *David Collins,* and *Karen M. Klaver;* for the Center for Individual Freedom by *Eric S. Jaffe;* for the Church of Jesus Christ of Latter-day Saints by *Von G. Keetch;* for the Electronic Privacy Information Center et al. by *Marc Rotenberg, Steven R. Shapiro,* and *Raymond Vasvari;* and for Real Campaign Reform.org, Inc., et al. by *William J. Olson, John S. Miles,* and *Herbert W. Titus.*

Briefs of *amici curiae* urging affirmance were filed for the Ohio Municipal League by *Barry M. Byron* and *John E. Gotherman;* and for the International Municipal Lawyers Association et al. by *Richard Ruda* and *James I. Crowley.*

Briefs of *amici curiae* were filed for the Brennan Center for Justice by *Burt Neuborne, Deborah Goldberg,* and *Richard L. Hasen;* and for Independent Baptist Churches of America by *Thomas W. King III.*

[1] Section 116.01 provides: "The practice of going in and upon private property and/or the private residences of Village residents in the Village by canvassers, solicitors, peddlers, hawkers, itinerant merchants or transient vendors of merchandise or services, not having been invited to do so by the owners or occupants of such private property or residences, and not having first obtained a permit pursuant to Section 116.03 of this Chapter, for the purpose of advertising, promoting, selling and/or explaining any product, service, organization or cause, or for the purpose of soliciting orders for the sale of goods, wares, merchandise or services, is hereby declared to be a nuisance and is prohibited." App. to Brief for Respondents 2a. The Village has interpreted the term "canvassers" to include Jehovah's Witnesses and the term "cause" to include their ministry. The ordinance does not appear to require a permit for a surveyor since such an individual would not be entering private property "for the purpose of advertising, promoting, selling and/or explaining any product, service, organization or cause, or for the purpose of soliciting orders for the sale of goods, wares, merchandise or services." Thus, contrary to the assumption of the dissent in its heavy reliance on the example from Dartmouth, *post,* at 172-173, 177, 179 (opinion of Rehnquist, C. J.), the Village's ordinance would have done nothing to prevent that tragic crime.

[2] Section 116.03 provides:

"(a) No canvasser, solicitor, peddler, hawker, itinerant merchant or transient vendor of merchandise or services who is described in Section 116.01 of this Chapter and who intends to go in or upon private property or a private residence in the Village for any of the purposes described in Section 116.01, shall go in or upon such private property or residence without first registering in the office of the Mayor and obtaining a Solicitation Permit.

"(b) The registration required by subsection (a) hereof shall be made by filing a Solicitor's Registration Form, at the office of the Mayor, on a form furnished for such purpose. The Form shall be completed by the Registrant and it shall then contain the following information:

"(1) The name and home address of the Registrant and Registrant's residence for five years next preceding the date of registration;

"(2) A brief description of the nature and purpose of the business, promotion, solicitation, organization, cause, and/or the goods or services offered;

"(3) The name and address of the employer or affiliated organization, with credentials from the employer or organization showing the exact relationship and authority of the Applicant;

"(4) The length of time for which the privilege to canvass or solicit is desired;

"(5) The specific address of each private residence at which the Registrant intends to engage in the conduct described in Section 116.01 of this Chapter, and,

"(6) Such other information concerning the Registrant and its business or purpose as may be reasonably necessary to accurately describe the nature of the privilege desired." Brief for Respondents 3a—4a.

[3] Section 116.04 provides: "Each Registrant who complies with Section 116.03(b) shall be furnished a Solicitation Permit. The permit shall indicate that the applicant has registered as required by Section 116.03 of this Chapter. No permittee shall go in or upon any premises not listed on the Registrant's Solicitor's Registration Form.

"Each person shall at all times, while exercising the privilege in the Village incident to such permit, carry upon his person his permit and the same shall be exhibited by such person whenever he is requested to do so by any police officer or by any person who is solicited." *Id.,* at 4a.

[4] Section 116.06 provides: "Permits described in Section 116.04 of this Chapter may be denied or revoked by the Mayor for any one or more of the following reasons:

"(a) Incomplete information provided by the Registrant in the Solicitor's Registration Form.

"(b) Fraud or misrepresentation contained in the Solicitor's Registration Form.

"(c) Fraud, misrepresentation or false statements made in the course of conducting the activity.

"(d) Violation of any of the provisions of this chapter or of other Codified Ordinances or of any State or Federal Law.

"(e) Conducting canvassing, soliciting or business in such a manner as to constitute a trespass upon private property.

"(f) The permittee ceases to possess the qualifications required in this chapter for the original registration." *Id.,* at 5a.

[5] Section 116.07 provides, in part: "(a) Notwithstanding the provisions of any other Section of this Chapter 116, any person, firm or corporation who is the owner or lawful occupant of private property within the territorial limits of the Village of Stratton, Ohio, may prohibit the practice of going in or upon the private property and/or the private residence of such owner or occupant, by uninvited canvassers, solicitors, peddlers, hawkers, itinerant merchants or transient vendors, by registering its property in accordance with Subdivision (b) of this Section and by posting upon

each such registered property a sign which reads `No Solicitation' in a location which is reasonably visible to persons who intend to enter upon such property.

"(b) The registration authorized by Subsection (a) hereof shall be made by filing a `No Solicitation Registration Form', at the office of the Mayor, on a form furnished for such purpose. The form shall be completed by the property owner or occupant and it shall then contain the following information: . . . ." *Id.,* at 6a.

[6] The suggested exceptions listed on the form are:

1. Scouting Organizations

2. Camp Fire Girls

3. Children's Sports Organizations

4. Children's Solicitation for Supporting School Activities

5. Volunteer Fire Dept.

6. Jehovah's Witnesses

7. Political Candidates

8. Beauty Products Sales People

9. Watkins Sales

10. Christmas Carolers

11. Parcel Delivery

12. Little League

13. Trick or Treaters during Halloween Season

14. Police

15. Campaigners

16. Newspaper Carriers

17. Persons Affiliated with Stratton Church

18. Food Salesmen

19. Salespersons. App. 229a.

Apparently the ordinance would prohibit each of these 19 categories from canvassing unless expressly exempted.

[7] Specifically, from the Book of "Matthew chapter 28, verses 19 and 20, which we take as our commission to preach. . .. So Jesus, by example, instituted a house-to-house search for people so as to preach the good news to them. And that's the activity that Jehovah's Witnesses engage in, even as Christ's apostles did after his resurrection to heaven." *Id.,* at 313a—314a.

[8] "The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press, see *Cantwell* v. *Connecticut,* 310 U. S., at 304-307 (invalidating a licensing system for religious and charitable solicitations under which the administrator had discretion to deny a license to any cause he deemed nonreligious); *Murdock* v. *Pennsylvania,* 319 U. S. 105 (1943) (invalidating a flat tax on solicitation as applied to the dissemination of religious ideas); *Follett* v. *McCormick,* 321 U. S. 573 (1944) (same), or the right of parents, acknowledged in *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925), to direct the education of their children, see *Wisconsin* v. *Yoder,* 406 U. S. 205 (1972) (invalidating compulsory school-attendance laws as applied to Amish parents who refused on religious grounds to send their children to school)." 494 U. S., at 881 (footnote omitted).

[9] In their briefs and at oral argument, the parties debated a factual issue embedded in the question presented, namely, whether the permit contains the speaker's name. We need not resolve this factual dispute in order to answer whether the ordinance's registration requirement abridges so much protected speech that it is invalid on its face.

[10] *Hynes* v. *Mayor and Council of Oradell,* 425 U. S. 610 (1976); *Martin* v. *City of Struthers,* 319 U. S. 141 (1943); *Murdock* v. *Pennsylvania,* 319 U. S. 105 (1943); *Jamison* v. *Texas,* 318 U. S. 413 (1943); *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940); *Schneider* v. *State (Town of Irvington),* 308 U. S. 147 (1939); *Lovell* v. *City of Griffin,* 303 U. S. 444 (1938).

[11] The question presented is similar to one raised, but not decided, in *Hynes.* The ordinance that we held invalid in that case on vagueness grounds required advance notice to the police before "casually soliciting the votes of neighbors." 425 U. S.,at 620, n. 4.

[12] *Hynes,* 425 U. S.,at 620, n. 4.

[13] *Talley* v. *California,* 362 U. S. 60 (1960); *McIntyre* v. *Ohio Elections Comm'n,* 514 U. S. 334 (1995).

[14] Although the Jehovah's Witnesses do not themselves object to a loss of anonymity, they bring this facial challenge in part on the basis of overbreadth. We may, therefore, consider the impact of this ordinance on the free speech rights of individuals who are deterred from speaking because the registration provision would require them to forgo their right to speak anonymously. See *Broadrick* v. *Oklahoma,* 413 U. S. 601, 612 (1973).

[1] Of course, fraud itself may be a crime. I assume, as does the majority, that the interest in preventing "crime" refers to a separate interest in preventing burglaries and violent crimes.

[2] It is sufficient that the ordinance serves the important interest of protecting residents' privacy. A law need only serve *a* governmental interest. Because the Court's treatment of Stratton's interest in preventing crime gives short shrift to Stratton's attempt to deal with a very serious problem, I address that issue as well.

[3] Indeed, an increased focus on apprehending criminals for "petty" offenses, such as not paying subway fares, is credited with the dramatic reduction in violent crimes in New York City during the last decade. See, *e. g.,* M. Gladwell, The Tipping Point: How Little Things Can Make a Big Difference (2000). If this works in New York City, surely it can work in a small village like Stratton.

# Note: The Supremacy Clause states the following as well

# Article VI

All debts contracted and engagements entered into, before the adoption of this Constitution, shall be as valid against the United States under this Constitution, as under the Confederation.

This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.

The Senators and Representatives before mentioned, and the members of the several state legislatures, and all executive and judicial officers, both of the United States and of the several states, shall be bound by oath or affirmation, to support this Constitution; but no religious test shall ever be required as a qualification to any office or public trust under the United States.

Furthermore, Exhibits of Mailboxes and a Permanent Sign are all included and labeled. This would be a violation of the equal protection 14th Amendment Violation as well. The 14th Amendment states the following,

Amendment XIV

Section 1.

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Wherefore, Petitioner hereby asks this Court for a Temporary injunction against the First Circuit Court of South Dakota and asks this court to set a hearing on whether or not a further injunction shall issue.

Dated this  24th day of October, 2023

ERIC SMITH
Signature of Petitioner

Exhibits of the activity performed/ petitioning and redressing government are included with this filing.

Note: There was a Report taken and submitted by the Yankton County Sheriffs department in Yankton against the City Police Department in regards to this incident. I recently asked them if a investigation was currently ongoing and they stated yes. The Court is still looking to proceed forward. Note: The Court and City Prosecutor are denying any discovery and any witnesses unless I subpoena them according to their policy,  "However", an attorney can do anything. This is also a violation of Due Process and A violation under the equal protection clause of the Fourteenth Amendment of the United States Constitution.